## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MORRIS PUBLISHING GROUP, LLC, et al.,[1] | Case No. 10-_____ |
| Debtors. | Joint Administration Requested |

## AFFIDAVIT OF STEVE K. STONE IN SUPPORT OF FIRST DAY MOTIONS

| | | |
|---|---|---|
| STATE OF GEORGIA | ) | |
| | ) ss: | |
| COUNTY OF AUGUSTA-RICHMOND | ) | |

STEVE K. STONE, being duly sworn, deposes and states:

1.    I am the Senior Vice President and Chief Financial Officer of Morris Publishing Group, LLC ("Morris Publishing"), a limited liability company organized under the laws of Georgia and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").[2]  Morris Publishing is the direct or indirect parent of each of the other Debtors herein.  I am generally familiar with the Debtors' day-to-day operations, business affairs and books and records.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Morris Publishing Group, LLC (9462); Athens Newspapers, LLC ("Athens") (3084); Broadcaster Press, Inc. (3275); Homer News, LLC ("Homer") (8613); Log Cabin Democrat, LLC ("Log Cabin") (5012); Morris Publishing Finance Co. (3044); MPG Allegan Property, LLC (5060); MPG Holland Property, LLC (5060); Southeastern Newspapers Company, LLC (5156); Southwestern Newspapers Company, L.P. (1328); The Oak Ridger, LLC (5060); The Sun Times, LLC ("Sun Times") (2529); Yankton Printing Company (8120); Stauffer Communications, Inc. (0047); and Florida Publishing Company (8216).  Athens's address is One Press Place, Athens, Georgia  30603.  Homer's address is 3482 Landings Street, Homer, Alaska  99603.  Log Cabin's address is 1058 Front Street, Conway, Arkansas 72033.  Sun Times's address is 104 S. Railroad Street, Ridgeland, South Carolina  29936.  All other Debtors maintain an address at 725 Broad Street, Augusta, Georgia  30901.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion (as hereinafter defined).

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner in the Debtors' chapter 11 cases, and no official committee has yet been appointed by the Office of the United States Trustee.

4.      In order to enable the Debtors to minimize the adverse effects of the commencement of the chapter 11 cases on their business operations, the Debtors have requested various types of relief in certain "first day" motions (each, a "First Day Motion" and collectively, the "First Day Motions").  The First Day Motions seek relief aimed at, among other things: (a) preserving customer relationships; (b) maintaining vendor confidence and employee morale; (c) ensuring the continuation of the Debtors' cash management systems and other business operations without interruption; (d) securing the necessary use of funds to continue the Debtors' operations; and (e) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process.

5.      I submit this affidavit (the "Affidavit") in support of the First Day Motions.  I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful reorganization of the Debtors and (c) is in the best interests of the Debtors, their estates and creditors.

6.      Except as otherwise indicated, all facts set forth in this Affidavit are based on my personal knowledge, on information supplied to me by other members of the Debtors'

management teams and/or professionals retained by the Debtors, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and present liquidity needs.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Affidavit on behalf of the Debtors.

7.     Part I of this Affidavit provides an overview of the Debtors' business operations and describes the Debtors' corporate history, prepetition capital and debt structure and the circumstances surrounding the commencement of these chapter 11 cases.  Part II sets forth the relevant facts in support of each of the First Day Motions and the Debtors' efforts to restructure and strengthen their balance sheet, preserve the enterprise for the Debtors' stakeholders and improve the Debtors' liquidity going forward.

## PART I

### A.     Overview of the Debtors' Business

8.     Debtor Morris Publishing is part of a private media business that has been owned and operated by the William S. Morris III family for three generations.  Morris Publishing is headquartered in Augusta, Georgia, and was formed in 2001 to assume the newspaper operations of its former parent, Morris Communications Company, LLC ("MCC").  The Debtors own and operate 13 daily newspapers and more than three dozen nondaily newspapers in the Southeast, Midwest, Southwest and Alaska, as well as city magazines and free community publications.

#### (1)     Daily Newspapers

9.     Newspapers form the Debtors' core business unit.  Their daily and nondaily newspapers have a total combined circulation of more than 450,000.  The Debtors have a concentrated presence in the Southeast, with four signature holdings, including the *Florida Times-Union (Jacksonville)*, the *Savannah Morning News*, the *Athens Banner-Herald* and the

*Augusta Chronicle*, their original and flagship newspaper.  The Debtors' daily newspapers have online sister publications as an additional service for readers and advertisers alike.  Both print and online editions consistently win industry awards for content, photography and design.  In all its news products, the Debtors are committed to local news coverage and to the highest standards of journalism.  As of the Petition Date, the Debtors' newspapers employed approximately 1,847 full-time employees and approximately 335 part-time employees

10.    The following table identifies the Debtors' 13 daily newspapers and their respective Web sites:

| Daily newspaper markets | Publication | Web site (http://www.) |
| --- | --- | --- |
| **Alaska** | | |
| Juneau | *Juneau Empire* | juneauempire.com |
| Kenai | *Peninsula Clarion* | peninsulaclarion.com |
| | | |
| **Arkansas** | | |
| Conway | *Log Cabin Democrat* | thecabin.net |
| | | |
| **Florida** | | |
| Jacksonville | *The Florida Times-Union* | jacksonville.com |
| St. Augustine | *The St. Augustine Record* | staugustine.com |
| | | |
| **Georgia** | | |
| Athens | *Athens Banner-Herald* | onlineathens.com |
| Augusta | *The Augusta Chronicle* | chronicle.augusta.com |
| Savannah | *Savannah Morning News* | savannahnow.com |
| | | |
| **Kansas** | | |
| Topeka | *The Topeka Capital-Journal* | cjonline.com |
| | | |
| **Minnesota** | | |
| Brainerd | *Brainerd Dispatch* | brainerddispatch.com |
| | | |
| **South Carolina** | | |
| Bluffton | *Bluffton Today* | blufftontoday.com |
| | | |
| **Texas** | | |
| Amarillo | *Amarillo Globe-News* | amarillo.com |
| Lubbock | *Lubbock Avalanche-Journal* | lubbockonline.com |

11.    Provided below are summaries of each of the seven largest daily newspapers owned and operated by the Debtors, based upon their 2008 audited reports.  Together, these newspapers account for approximately 90% of the Debtors' average daily circulation.

| Newspaper | Avg. Daily Circulation* | Avg. Sunday Circulation |
|---|---|---|
| Florida Times-Union | 140,977 | 197,668 |
| Augusta Chronicle | 70,129 | 85,870 |
| Savannah Morning News | 48,059 | 59,697 |
| Topeka Capital-Journal | 44,059 | 53,267 |
| Lubbock Avalanche-Journal | 47,867 | 55,455 |
| Amarillo Daily-News | 43,269 | 52,454 |
| Athens Banner-Herald | 27,117 | 29,177 |

12.    <u>Jacksonville</u>:  *The Florida Times-Union,* which the Debtors have operated since 1983, is the largest newspaper and serves the Jacksonville, Florida, metropolitan area of 516,000 households with an adult population of approximately 1.0 million.

13.    <u>Augusta</u>:  *The Augusta Chronicle,* which the Debtors have operated since the early 1940s, is their second largest newspaper and serves the Augusta, Georgia, community of approximately 196,000 households with an adult population of approximately 400,000.

14.    <u>Savannah</u>:  The *Savannah Morning News*, which the Debtors have operated since the 1960s, serves the Savannah, Georgia, community of approximately 127,000 households with an adult population of approximately 253,000.

15.    <u>Topeka</u>:  *The Topeka Capital-Journal,* which the Debtors have operated since 1995, serves the Topeka, Kansas, community of approximately 93,000 households with an adult population of approximately 179,000.

16.    <u>Lubbock</u>:  The *Lubbock Avalanche-Journal,* which the Debtors have operated since 1972, serves Lubbock, Texas, a community of approximately 106,000 households with an adult population of approximately 196,000.

17.    <u>Amarillo</u>:  The *Amarillo Globe-News,* which the Debtors have operated since 1972, serves Amarillo, Texas, a community of approximately 87,000 households with an adult population of approximately 189,000.

18.    <u>Athens</u>:  The *Athens Banner-Herald,* which the Debtors have operated since 1972, serves Athens, Georgia, a university community of approximately 71,000 households with an adult population of approximately 150,000.

**(2)    Non-Daily Newspapers**

19.    The following table sets forth the Debtors' non-daily publications, most of which are in close proximity to the daily newspaper markets identified above:

| Market | Publication |
| --- | --- |
| **Alaska** | |
| Homer | *Homer News* |
| Juneau | *Capital City Weekly* |
| | |
| **Florida** | |
| Jacksonville | *My Clay Sun, Shorelines, St. Johns Sun, Nassau Sun, Mandarin Sun, Westside Sun, Southside Sun, Arlington Sun, Northside Sun* |
| | |
| **Georgia** | |
| Bryan County | *Bryan County Now* |
| Effingham County | *Effingham Now* |
| Martinez | *The Columbia County News-Times* |
| Thomson | *The McDuffie Mirror* |
| Louisville | *The News and Farmer and Wadley Herald/The Jefferson Reporter* |
| Sylvania | *Sylvania Telephone* |
| | |
| **Minnesota** | |
| Pequot Lakes | *Lake Country Echo* |
| Pine River | *Pine River Journal* |
| | |
| **South Carolina** | |
| Barnwell | *The People-Sentinel* |
| Edgefield | *The Citizen News* |
| Hampton County | *The Hampton County Guardian* |
| Hardeeville | *Hardeeville Today* |

| | |
|---|---|
| North Augusta | *North Augusta Today (NorthAugustaToday.com)* |
| Ridgeland | *Jasper County Sun* |
| | |
| **Texas** | |
| Lubbock | *Frenship Today* |

### (3)  City and Other Magazines

20.    The Debtors' city magazines, located in Athens, Augusta and Savannah, cover the people, issues and events of their respective communities.  In addition, many of the Debtors' daily newspapers produce additional magazines that regularly serve their respective communities with high quality local features.  Publications such as *Coastal Antiques and Art, Coastal Senior* and *Savannah Coastal Parent* are produced through the Morris Publishing daily newspaper the *Savannah Morning News*.  *Skirt!* is a free monthly magazine with circulation in 14 markets across the country that features content on issues important to women.

21.    The following tables set forth the city and other magazines and publications either owned and operated by the Debtors or licensed to a third party:

| **Market** | **City Magazine** |
|---|---|
| | |
| **California** | |
| Ventura | *Skirt!* magazine[1, 2] |
| | |
| **Georgia** | |
| Athens | *Athens Magazine* |
| Augusta | *Augusta Magazine* |
| Savannah | *Savannah Magazine* |

| **Market** | **Other Magazines** |
|---|---|
| | |
| **Alabama** | |
| Birmingham | *Skirt!* magazine[1, 2] |
| | |
| **Florida** | |
| Jacksonville | *Car Paper* |

| | |
|---|---|
| Jacksonville | *Career Paper* |
| Jacksonville | *Discover Jacksonville* |
| Jacksonville | *Skirt!* magazine[1, 2] |
| Jacksonville | *H Magazine: The Pulse of Today's Health* |
| St. Augustine | *Eco Latino* |
| Tampa/St. Petersburg | *Skirt!* magazine[1, 2] |
| | |
| **Georgia** | |
| Atlanta | *Skirt!* magazine[1, 2] |
| Athens | *Skirt!* magazine[2] |
| Augusta | *Skirt!* magazine |
| Augusta | *Augusta Family Magazine* |
| Savannah/Hilton Head | *Skirt!* magazine |
| Savannah | *Savannah Coastal Parent* |
| Savannah/Hilton Head | *Coastal Antiques and Art* |
| Savannah/Hilton Head/B | *Coastal Senior* |
| | |
| **Kentucky** | |
| Lexington | *Skirt!* magazine[1] |
| | |
| **Massachusetts** | |
| Boston | *Skirt!* magazine[1, 2] |
| | |
| **Minnesota** | |
| Brainerd | *Her Voice* |
| Pequot Lakes | *Echoland-Piper Shopper* |
| Pine River | *Echoland-Piper Shopper* |
| | |
| **North Carolina** | |
| Charlotte | *Skirt!* magazine |
| Greensboro | *Skirt!* magazine[1] |
| Raleigh | *Skirt!* magazine[1] |
| Winston Salem | *Skirt!* magazine[1] |
| | |
| **South Carolina** | |
| Beaufort | *The Boot* |
| Beaufort | *Jet Stream* |
| Charleston | *Skirt!* magazine |
| Columbia | *Skirt!* magazine |
| Greenville | *Skirt!* magazine[1] |
| Ridgeland | *The Jasper Shopper* |
| | |
| **Tennessee** | |
| Knoxville | *Skirt!* magazine[1] |
| Memphis | *Skirt!* magazine[1] |

| | |
|---|---|
| **Texas** | |
| Houston | *Skirt!* magazine[1, 2] |
| Lubbock | *Skirt!* magazine[2] |
| | |
| **Virginia** | |
| Hampton Roads | *Skirt!* magazine[1] |
| Richmond | *Skirt!* magazine[1] |

[1]Licensed to third party
[2]Online only party

22.    Free community papers are dedicated advertising vehicles designed to provide customers with reliable, no-frills opportunities for sales and purchases, along with practical community news and information.  Both readers and advertisers look to these publications, popularly known as "shoppers," for quick contact, quick information and quick results.  The Debtors' shoppers are published in eight states and have a total circulation of approximately 230,000.

### B.    Overview of Debtors' Operations

### (1)    Properties

23.    The Debtors believe that all of their properties are in generally good condition and suitable for current operations.  The Debtors' main facilities are shown on the following table.  The Debtors' production facilities, which are indicated by the presence of a press line, are in most cases, newspaper office facilities as well.  The Debtors own all of the following real estate and facilities of the following seven largest newspapers except the real estate and facility located in Savannah, Georgia, which are operated under a lease with an affiliate.

| State | City | Press | Sq. Ft. |
|---|---|---|---|
| **Alaska:** | Homer | 0 | 2,418 |
| | Kenai | 1 | 19,307 |
| | Juneau | 1 | 55,045 |
| **Arkansas:** | Conway | 1 | 20,431 |
| **Florida:** | St. Augustine | 1 | 55,264 |
| | Jacksonville | 4 | 328,106 |
| **Georgia:** | Athens | 1 | 110,000 |
| | Augusta | 1 | 159,758 |
| | Louisville | 0 | 2,500 |
| | Savannah | 3 | 220,000 |
| **Kansas:** | Topeka | 1 | 153,467 |
| **Minnesota:** | Brainerd | 1 | 25,500 |
| | Pine River | 0 | 1,750 |
| | Pequot Lakes | 0 | 4,563 |
| **South Carolina:** | Ridgeland | 0 | 1,500 |
| | Barnwell | 0 | 15,000 |
| | Hampton County | 0 | 3,000 |
| | Ridgeland | 0 | 1,000 |
| **Texas:** | Amarillo | 1 | 84,251 |
| | Lubbock | 1 | 160,644 |

**(2)    Employees**

24.    As noted above, the Debtors employed approximately 1,847 full time employees and approximately 335 part-time employees as of the Petition Date.  None of these employees is covered by collective bargaining agreements.  The Debtors believe that relations with their employees are generally good.

25.    The Debtors provide medical and group life insurance programs for full-time employees.  The Debtors' are self insured under their medical insurance plan and pay approximately two-thirds of employee medical costs.

(3)      **Shared Services**

26.      MCC has provided and will continue to provide management and related services to the Debtors, as well as to all of its operating subsidiaries, pursuant to an amended services agreement.  A significant portion of MCC's time was and will continue to be devoted to the Debtors' affairs.

27.      MCC and its subsidiaries or affiliates currently provide senior executive management services and personnel (including my services and the services of Mr. Morris III, Mr. Morris IV, and Craig S. Mitchell), as well as general and administrative services, such as legal, accounting, finance and treasury, tax, merger and acquisition, risk management, human resources/personnel, employee benefits, travel and aircraft usage, corporate communications, real estate, online services, research services, architectural and engineering, and external and internal audit functions, purchasing and participation in the Shared Services Center operated by MStar Solutions, LLC ("MStar").

28.      The parties have, on occasion, amended the Management and Services Agreement.  On May 16, 2008, the Debtors entered into a second amendment to the Management and Services Agreement, which was designed to eliminate the fees payable by the Debtors for management, technology and shared services to Morris Communications for the period from May 1, 2008 through December 31, 2008.  The intent of this amendment was to permit the Debtors to retain cash and to reduce the Debtors' operating expenditures.  Effective October 1, 2008, the Debtors entered into a third amendment to the Management and Services Agreement which reinstated the payment of these fees.  Finally, pursuant to the Restructuring Support Agreement (as such term is defined herein) on January 6, 2010, Morris Publishing entered into a fourth amendment to the Management and Services Agreement to, among other things, fix the

combined annual payment of the management fees and the MStar technology fees at actual costs in an amount not to exceed $22 million annually.

### (4)    Competition

29.    While most of the Debtors' daily newspapers are the only daily newspapers published in their respective communities, they do compete within their own geographic areas with other weekly newspapers in their own or adjacent communities, other daily newspapers published in adjacent or nearby cities and towns, as well as regional and national newspapers. Competition for advertising and paid circulation comes from local, regional and national newspapers, shoppers, radio and television broadcasters, cable television (national and local), direct mail, electronic media, including the Internet, and other forms of communication and advertising media that operate in our markets.   Competition for advertising revenue (the aggregate amount of which is largely driven by national and regional general economic conditions) is largely based upon advertiser results, readership, advertising rates, demographics and circulation levels, while competition for circulation and readership is based largely upon the content of the newspaper, its price and the effectiveness of its distribution.   Our non-daily publications, including shoppers, compete primarily with direct mail advertising, shared mail packages and other private advertising delivery services.

### C.    Corporate History and Structure

### (1)    Origins of the Newspaper Business

30.    The Morris family became involved with *The Augusta (Ga.) Chronicle* in 1929, when William S. Morris, Jr., father of today's chairman, became a bookkeeper at the daily newspaper, which was started in 1785 as the *Augusta Gazette*, the town's first newspaper.   Mr. Morris Jr. purchased *The Augusta Chronicle* in the early 1940s with a partner, and later purchased his partner's half interest.   William S. Morris III joined the newspaper business in the

1950s and has been a chairman for more than three decades.  William S. Morris IV, his elder son, is president and CEO of Morris Publishing.

31.    With the Augusta morning and afternoon newspapers as a base, the business began to expand.  In the 1960s, the business acquired two other daily newspapers in Georgia — one in Savannah and one in Athens.   In 1972, the business expanded into Texas, with newspapers in Amarillo and Lubbock.  In 1983, the business acquired The Florida Publishing Company, which included *The Florida Times-Union* (Jacksonville, Florida) and other Florida newspapers.

32.    The business continued to expand in 1995 with the purchase of all of the outstanding stock of Stauffer Communications, Inc.   This purchase included 20 daily newspapers, nondaily newspapers and shoppers, some of which subsequently were sold (as described below).

33.    As noted above, in 2001, Morris Publishing was formed to assume the newspaper operations of MCC.  The original name, "MCC Newspapers, LLC," was changed to Morris Publishing Group, LLC, in July 2003.

34.    In recent years, Morris Publishing continued to expand.   In 2005, Morris Publishing launched *Bluffton Today*, a free daily newspaper, in Bluffton, South Carolina, a vehicle for new innovations in daily newspaper and Web publishing, with much of the content being user contributed.  In 2006, Morris Publishing acquired from Community Newspapers, Inc., *The (Barnwell, S.C.) People-Sentinel*, *The Hampton County (S.C.) Guardian*, *The (Edgefield, S.C.) Citizen News* and the *Sylvania (Ga.) Telephone*, all nondaily newspapers located within the Augusta market area.  In 2007, Morris Publishing launched *North Augusta (S.C.) Today*, a free weekly community newspaper specializing in local news and citizen journalism.   An online companion to the printed product, NorthAugustaToday.com, mirrors the weekly printed

publication and posts breaking news between publications.   In 2007, Morris Publishing also launched *Bryan County (Ga.) Now*, *Effingham County (Ga.) Now*, and *Frenship (Lubbock, Texas) Today*, all weekly newspapers serving the rural areas of the company's Savannah, Athens and Lubbock markets.

35.   In 2007, Morris Publishing entered into a strategic alliance with Yahoo! Inc. ("*Yahoo!*"), joining the recently formed media consortium, which allows the company to reach *Yahoo!*'s community of online users.   Part of that potential has been realized through the company's agreement with *Yahoo!* for HotJobs, Search Services, Content Matched Ads and Sponsored Search Ads and through the cross selling of ad space between the Debtors' properties and *Yahoo!* Web sites.   This arrangement leverages the Debtors' reach into the local advertising community and leverages *Yahoo!*'s reach into the local, national and global population.

36.   On November 30, 2007, Morris Publishing sold fourteen daily newspapers, three nondaily newspapers, a commercial printing operation and other related publications to GateHouse Media, Inc. ("GateHouse").

**(2)   Current Corporate Structure**

37.   On January 28, 2009, Shivers Trading & Operating Company ("Shivers"), Morris Publishing's indirect corporate parent, and MCC, then Morris Publishing's direct parent, consummated a reorganization of their company structure.   In the reorganization, (i) MCC distributed ownership of all membership interests in Morris Publishing to a new parent, MPG Newspaper Holding, LLC ("MPG Holdings"), a subsidiary of Shivers, and (ii) Shivers distributed beneficial ownership of MCC to an affiliated corporation, both subject to the existing pledges of the membership interests of Morris Publishing and MCC to the administrative agent for the lenders under the relevant credit agreement.   Subsequent to the reorganization, (i) Morris

Publishing remains an indirect subsidiary of Shivers, and (ii) MCC remains an affiliate of Morris Publishing, but is no longer Morris Publishing's parent.

**D.      The Debtors' Debt Structure**

**(1)      The Senior Credit Facility**

38.      On October 15, 2009, the Debtors refinanced their senior debt pursuant to a transaction in which third parties and affiliated entities acquired the then-existing $136.5 million senior secured credit facility indebtedness and amended the credit agreement governing such indebtedness.  As a result of this senior debt refinancing, (1) an affiliate of ACON Investments, L.L.C. named Tranche Holdings, LLC now holds the Tranche A term loan, which has an aggregate principal amount of $19.7 million, (2) a Morris Publishing affiliate holds the Tranche B term loan, which has an aggregate principal amount of $6.8 million plus accrued PIK interest since the date of the Existing Credit Agreement, and (3) certain Morris Publishing affiliates now hold the Tranche C term loan, which has an aggregate principal amount of $110 million plus accrued PIK interest since the date of the Existing Credit Agreement.

**(2)      The Old Notes**

39.      On August 7, 2003, Morris Publishing and Debtor Morris Publishing Finance Company ("Morris Publishing Finance" and, together with Morris Publishing, the "Issuers"), entered into an Indenture (the "Indenture") with Wachovia Bank, National Association, as Trustee ("Wachovia").  In accordance with the Indenture, the Issuers issued $250 million in 7% Senior Subordinated Notes Due 2013 (collectively, the "Old Notes").  In September 2003, an additional $50 million of Old Notes were issued.  The Old Notes are unsecured and contractually subordinated to the senior secured debt.  Each of the non-Issuer Debtors and certain non-Debtor affiliates of the Issuers (collectively, the "Old Note Guarantors") guaranteed the obligations

under the Old Notes.[3]    Pursuant to the terms of the Old Notes and the Indenture, interest payments are due on February 1 and August 1 of each year, until maturity.    As of the Petition Date, the total principal amount of indebtedness on account of the Old Notes was approximately $278.5 million.

## E.    Overview of the Newspaper Industry

### (1)    Key Cost Drivers:  Labor and Newsprint

40.    <u>Labor</u>:  Labor costs represent approximately 35-40% of total industry revenues. Total industry employment steadily declined in the 1990s, as significant investment in more automated production methods has led to efficiencies and higher productivity per worker. However, industry wide medical and health care insurance and pension benefit costs are rising.

41.    <u>Newsprint</u>:  Newsprint costs (the cost of basic raw material) represent 10-15% of newspapers' total revenues and is purchased by most companies from suppliers through a newspaper consortium.  The supply of newsprint should remain adequate for the industry needs, and the industry's relationship with the newsprint producers is generally good.  However, price fluctuations have a significant effect on each newspaper company's results of operations.

42.    Newsprint prices are volatile and fluctuate based upon factors that include foreign currency exchange rates and both foreign and domestic production capacity and consumption. The Debtors have not entered into derivative contracts for newsprint.

---

[3]    The Old Note Guarantors are comprised of the following:  Yankton Printing Company; Broadcaster Press, Inc.; The Sun Times, LLC; Homer News, LLC; Log Cabin Democrat, LLC; Athens Newspapers, LLC; Southeastern Newspapers Company, LLC; Stauffer Communications, Inc.; Florida Publishing Company; Southwestern Newspapers Company, L.P.; Fall Line Publishing, Inc.; The Blue Springs Examiner, LLC; The Examiner of Independence, LLC; The Newton Kansan, LLC; Oak Grove Shopper, LLC; The Oak Ridger, LLC; MPG Allegan Property, LLC; and MPG Holland Property, LLC.

(2)    **Key Revenue Drivers: Advertising and Circulation**

43.    The newspaper industry is reported to generate annual revenues of approximately $57 billion primarily based on advertising and circulation.  On average, 80% of its total revenue is derived from print and online advertising, while 20% comes from circulation.  Approximately 74% of all newspaper revenue is from the print advertising media.

44.    While newspaper revenue is directly impacted by the level of advertising, it is indirectly impacted by market conditions and factors like changes in supply and demand for various products and changes in interest rates.  Newspaper companies can affect, to some extent, the demand for advertising by influencing circulation and readership, and by adjusting advertising rates, sales efforts and customer service.

45.    There are three major classifications of newspaper advertising; retail, classified, and national:

- Retail advertising, also called local advertising, makes up approximately 50% of total newspaper advertising.  Main advertisers in this category are department and discount stores, grocery and drug stores, and furniture and appliance stores with local accounts and/or local retail operations.  Local retail businesses that do display advertising also fall in this category.

- Classified advertising includes employment, real estate sales or rentals, automotive and other categories, and it comprises approximately 34% of total advertising.  It is the most cyclical type of newspaper advertising.

- National advertising, also known as general advertising, includes manufacturers' product advertising, travel and resorts, or retailers with no local representatives in the market.  This category is the smallest, comprising approximately 16% of the total, and carries the highest rates.

46.    In recent years, the slumping retail market has reduced demand for retail advertising, and the rise in the national unemployment rate, coupled with the decline in the real estate and auto sectors, has led to a significant decline in classified advertising.

47.     With the increased competition from other forms of media and slumping advertising revenues, the downward pressure on newspaper earnings will likely remain intense in the near-term.

**(3)     Circulation and Readership**

48.     Circulation is important to the newspaper industry in two ways.  From an editorial perspective, increased circulation demonstrates the quality of the editorial product and the demand for the paper from readers.  From a revenue perspective, advertisers are willing to pay higher rates for greater reach.

49.     The newspaper industry has faced circulation and readership declines over the past 25 years, with a large part of the decline due to a decline in evening newspapers, and the emergence of nightly news broadcasts, 24-hour news channels, and the Internet.  The total number of morning daily newspapers has more than doubled over that period.

50.     The advertising recession over the past few years has driven publishing companies to reduce their operating costs.  Consequently, the industry is experiencing a trend toward consolidation.  By owning multiple properties in specific markets, newspaper publishers can spread costs and achieve greater efficiencies.

51.     Telemarketing rules adopted by the Federal Trade Commission and Federal Communications Commission, including the "National Do-Not-Call Registry" and regulations, have had an impact on the industry's ability to source subscriptions through telemarketing.  The industry has implemented several programs to offset the effect of this legislation and is focusing on retaining current customers through stronger retention efforts, which include increased customer service, lengthening the subscription periods for new and existing customers, and new payment methods.

52.     Newspapers have begun efforts in circulation and advertising target marketing segmentation.  This allows newspapers to target individual households based on various demographic and lifestyle characteristics, focusing on those that "look like" the best and most desired customers.  Newspapers believe that this effort plus increased retention efforts will allow them to better control circulation volumes and to grow circulation in the geographic and demographic groups that advertisers want.

### (4)     Online

53.     The Internet provides an additional medium through which newspapers reach audiences, and newspapers have ventured online to increase readership and leverage their local brands.  Prior to the economic recession in 2008 and 2009, overall Internet and home broadband penetration had risen substantially during the previous ten years, with approximately one-third of all Internet users looking for local news turning to online newspapers.

54.     Online advertising revenue makes up approximately 7% of total newspaper advertising.  Online advertising consists of display, banner, rich media, directories, classified or other advertising on Web sites associated and integrated with print publications and on third-party affiliated Web sites, such as *Yahoo!*.

55.     Historically, the majority of local online advertising dollars came from classifieds, with the Internet accounting for about 13-15% of all help wanted revenues.  However, due to the current economic conditions and competition from other third-party online vendors, newspapers have seen a significant decline from all major classified online categories.

### F.     Events Leading to Chapter 11

### (1)     Recent Financial Results

56.     In fiscal year 2008, the Debtors recorded revenues of approximately $321.8 million, resulting in a net loss of approximately $140.7 million.  During this time, advertising

and circulation accounted for approximately 78.2% and 18.9% of the Debtors' revenue, respectively. In fiscal year 2008, advertising revenue had declined to approximately $251.7 million (from approximately $306.7 million in 2007), and circulation revenue had increased to approximately $60.9 million (from approximately $57.6 million in 2007).

57. More recently, for the nine month period ending September 30, 2009, the Debtors recorded revenues of $190.0 million (down from $243.1 million for the same period in 2008), resulting in a net loss of $13.2 million (compared to a net loss of $155.6 million for the same period in 2008). During this time, advertising revenue declined by 28.6%, while circulation revenue increased by 5.6%. At September 30, 2009, the Debtors' consolidated financial statements reported total assets and liabilities of approximately $175.5 million and $482.4 million, respectively.

58. While the Debtors' performance is comparable to that of their peers, operations have been adversely affected by the general deterioration in the publishing and newspaper industries, particularly through the continuing severe decline in advertising revenue in this recession and the permanent loss to other media within various categories. The current state of the newspaper industry is reflected in (a) the chapter 11 filings in recent months of Triple Crown Media, Inc., The Star Tribune Company (Minneapolis Star Tribune), the Journal Register, the Tribune Company (the Chicago Tribune, Los Angeles Times and Baltimore Sun), Philadelphia Newspaper LLC (the Philadelphia Inquirer and the Philadelphia Daily News), the Sun-Times Media Group, Inc. (the Chicago Sun Times) and Freedom Communications Holding, Inc. (the Orange County Register) and (b) the recent closure of several longstanding newspapers, such as the Rocky Mountain News, the Seattle Post-Intelligencer and the Tucson Citizen. As a result of this general industry-wide deterioration, the Debtors face increasing constraints on their

liquidity, including their ability to service the approximately $417 million in combined indebtedness owed to their lenders and noteholders.

### (2)    Operational Restructuring and Cost Cutting Measures

59.    Before the Petition Date, in response to the challenges facing their businesses, the Debtors' began reducing their labor force and embarked on other endeavors to decrease operating costs. Among other things, during 2008, work force reductions were made as part of multiple efficiency and consolidation efforts taken in response to declining revenues and the current economic conditions. Severance payments were made to terminate employees based on pay level and length of service, and a significant portion of work force reductions were realized from natural attrition.

60.    In addition, effective July 13, 2008, the Debtors indefinitely suspended the employer match (up to 5% of each eligible employee's qualifying wages) under the 401k benefit plan. The Debtors also terminated coverage under the post retirement benefit plan for all claims incurred after December 31, 2008.

61.    Moreover, effective April 1, 2009, the Debtors reduced employee wages by 5 to 10 percent, with the pay cuts designed to preserve jobs in the current economic environment. Wage reductions were 5 percent for those who earned less than $25,000 per year, 7.5 percent for those earning between $25,000 and $50,000, and 10 percent for those earning $50,000 or more (which includes all Morris Publishing senior executives).

62.    The Debtors intend to continue to implement aspects of the cost cutting and restructuring measures, both during these reorganization cases and after their anticipated emergence from chapter 11 bankruptcy.

(3)    **The Restructuring Support Agreement**

63.    In early 2009, the Debtors entered into discussions with certain of their prepetition creditors to reduce the Debtors' substantial debt load and address liquidity concerns threatening the long-term viability of the company.  In September 2009, the Debtors reached agreement with an ad hoc committee (the "Ad Hoc Committee") of holders of the Old Notes on the general terms of a comprehensive balance sheet restructuring of the Debtors' debt structure (the "Restructuring").  Pursuant to an October 30, 2009 Restructuring Support Agreement (as amended, the "Restructuring Support Agreement"), the Restructuring was to occur either through (a) an out-of-court offer (the "Exchange Offer") to acquire all $278.5 million in principal amount of outstanding Old Notes for $100 million aggregate principal amount of Floating Rate Secured Notes due 2014 (collectively, the "New Notes") or (b) alternatively, through cases filed under chapter 11 of the Bankruptcy Code and confirmation of a prepackaged chapter 11 plan (the "Plan").  The closing of the Exchange Offer was conditioned upon, among other things, at least 99% of the aggregate principal amount of Old Notes being validly tendered and not withdrawn.

64.    On December 14, 2009, the Debtors launched the Exchange Offer and also began soliciting votes to accept or reject the Plan, which contemplates a full recovery for all allowed claims other than those held by holders of Old Notes.  Because less than 99% of the aggregate principal amount of Old Notes were validly tendered and not withdrawn, a condition to closing the Exchange Offer was not satisfied.  Nonetheless, the Plan has been accepted overwhelmingly by the only class of creditors entitled to vote on the Plan.  Accordingly, contemporaneously herewith, the Debtors have filed the Plan and its accompanying disclosure statement, along with a motion seeking approval of the adequacy of the disclosure statement, approval of the solicitation procedures and confirmation of the Plan.  The Debtors believe that the Plan, once

confirmed, will rationalize their balance sheet in a way that allows them to service their debt, fund future operations and support their long-term business plans.

## PART II

65.    Concurrently with the filing of these chapter 11 cases, the Debtors have filed a number of First Day Motions, consisting of procedural and administrative motions and motions relating to financing matters and the Debtors' business operations.  I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein is critical to the Debtors' ability to achieve a successful reorganization.  Factual information with respect to each First Day Motion is provided below and in each First Day Motion.

**A.      Procedural and Administrative Motions**

**(1)      Motion Of The Debtors For An Order Directing Joint Administration of Their Related Chapter 11 Cases and Waiving Requirements of Bankruptcy Code Section 342(c)(1) And Bankruptcy Rules 1005 And 2002(n)**

66.    These chapter 11 cases involve 15 affiliated Debtors.  Many, if not most, of the motions, applications, and other pleadings filed in these chapter 11 cases will relate to relief sought jointly by all of the Debtors.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  Accordingly, the interests of the Debtors, their creditors, and other parties-in-interest would be best served by the joint administration of these chapter 11 cases.  Joint administration of the Debtors' chapter 11 cases also will ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of 15 independent chapter 11 cases.

67.    Joint administration of these chapter 11 cases will promote efficiency and ease administration for the Debtors, their creditors, other parties-in-interest and the Court.  It will permit the Clerk of the Court to utilize a single docket for all of the cases, creating a centralized location for the numerous documents that are likely to be filed and served in these cases by the

Debtors, creditors and parties-in-interest, and for all notices and orders entered by the Court.  A single docket also will make it easier for parties-in-interest in each of the chapter 11 cases to stay apprised of all the various matters before the Court.  The Debtors also will likely realize substantial cost savings and reduced administrative burdens by sending notices in the cases to a single matrix of creditors and Rule 2002 list, rather than maintaining over a dozen separate notice lists.

68.     In addition, Debtors submit that use of a simplified caption, without reference to their respective states of incorporation and complete tax identification numbers, will eliminate cumbersome and confusing procedures and will ensure a uniformity of pleading identification.

69.     For the foregoing reasons, the Debtors believe that it is in the best interest of the Debtors, their estates and creditors, other parties-in-interest and the Court that an order be entered (a) directing the joint administration of these chapter 11 cases and the consolidation thereof for procedural purposes only and (b) waiving the requirement that the Debtors' caption contain tax identification numbers and addresses.

**(2)      Motion For Entry of Order (A) Granting Additional Time to File, or Waiving the Requirement of Filing, Schedules and Statements of Financial Affairs and (B) Directing the United States Trustee Not to Convene a Meeting of Creditors or Equity Security Holders**

70.     The Debtors seek entry of an order, granting the Debtors an extension of forty-five (45) days (in addition to the automatic extension of 15 days under Local Rule 1007-1) to file their Schedules and Statements.  The requested extension would give the Debtors an initial total of sixty (60) days from the Petition Date to file their Schedules and Statements.

71.     Cause exists to extend the deadline for the filing of the Debtors' Schedules and Statements as requested based on (a) the size and complexity of the Debtors' businesses; (b) the

number of Debtors and potential number of creditors of the Debtors; and (c) the numerous burdens imposed by the Debtors' reorganization efforts.

72.     The size of the Debtors' businesses and the complexity of their chapter 11 cases are significant.  There are 15 Debtors in these chapter 11 cases, with a long corporate history and operations across the country.  The Debtors maintain numerous plants and processing facilities to support their business operations.  The Debtors have approximately 2,200 employees and several hundred other potential creditors.  The Debtors reported assets of $175.5 million in the most recent filing with the Securities and Exchange Commission.

73.     Completing the Schedules and Statements will require the collection, analysis, and compilation of a massive amount of data.  The Debtors are party to numerous contracts, leases, and licenses that must be assembled and reviewed as part of the process of completing the Schedules and Statements.  The magnitude of the task, when taken together with the considerable stresses of preparing for the filing of these chapter 11 cases, the anticipated burdens of preparing the Debtors' transition into chapter 11, and the pre-existing, ongoing day-to-day responsibilities of operating the Debtors' businesses, supports an extension of the deadline set forth in the Bankruptcy Rules and Local Rules for filing the Schedules and Statements.

74.     Moreover, to the extent confirmation of the Debtors' Plan occurs before the expiration of such extended period, the Debtors request that such confirmation be deemed to act as a waiver of the requirement to file the Schedules and Statements.  Given the prepackaged nature of the chapter 11 cases, the Debtors believe that the purposes served by filing the Schedules and Statements generally have been fulfilled by other means, and that the completion of the Schedules and Statements are not justified given the costs to the Debtors' estates – in terms of the expenditure of financial and human resources.  In addition, certain of the information contained in such Schedules and Statements is available in the Disclosure Statement.  A debtor is

generally required to file the Schedules and Statements in order to permit parties in interest to understand and assess the debtor's assets and liabilities and thereafter negotiate and confirm a plan of reorganization.  As the Debtors already have negotiated the Plan and solicited votes from those parties entitled to vote thereon, who, upon solicitation, have voted overwhelmingly to accept the Plan, one of the primary justifications for requiring the Debtors to file the Schedules and Statements does not exist in the chapter 11 cases, and preparation of the Schedules and Statements would be unnecessarily burdensome to the Debtors' estates.

75.     The Debtors filed the chapter 11 cases to implement and effectuate the Plan and, as described above, the Debtors solicited the requisite acceptances of the Plan prior to commencing the chapter 11 cases.  The Debtors intend to proceed expeditiously to confirm the Plan and emerge from chapter 11 as quickly as possible.

76.     Therefore, the Debtors submit that cause exists for the Court to direct the U.S. Trustee not to convene a meeting of creditors or equity security holders pursuant to Bankruptcy Code § 341(e) if the Plan is confirmed within 60 days after the Petition Date.

**(3)      Debtors' Motion for (I) Waiver Of Requirement For Filing List Of Creditors And (II) Authority To Establish Procedures For Notifying Creditors Of The Commencement Of The Debtors' Chapter 11 Cases (the "<u>Creditors Notification Motion</u>")**

77.     The Debtors request entry of an order:  (a) waiving the requirement of filing a list of creditors, co-debtors and parties to executory contracts on the Petition Date and (b) authorizing the implementation of the Notice of Commencement Procedures, which establish guidelines for: (i) mailing the notice of commencement of the chapter 11 cases (the "<u>Notice of Commencement</u>") to creditors and equity security holders and (ii) publishing the Notice of Commencement.

78.     The Debtors have filed contemporaneously herewith a motion to retain and employ Kurtzman Carson Consultants (the "Notice and Tabulation Agent") as notice, claims processing and tabulation agent in these chapter 11 cases.  As soon as practicable after the Petition Date, the Debtors will furnish their list of creditors to their Notice and Tabulation Agent so that the Notice and Tabulation Agent can undertake the mailing of the Notice of Commencement to the creditors on such list.  Creditors will be notified of the commencement of these cases through their receipt of the Notice of Commencement.  Given that the Notice and Tabulation Agent will receive a list of creditors and use the list to furnish the Notice of Commencement to creditors, filing a list of creditors on the Petition Date will serve no useful purpose.

79.     In addition to mailing the Notice of Commencement to the Debtors' creditors, the Debtors propose to publish, as soon as practicable after the commencement of these chapter 11 cases, the Notice of Commencement, substantially in the form of the notice annexed to the Creditors Notification Motion as Exhibit B, in each of their 13 daily newspapers.  The Debtors believe that these publications will be most likely to reach those creditors who may not have received notice by mail.

80.     These proposed procedures are beneficial to the Debtors' estates and creditors because they provide actual notice to all of the Debtors' creditors in an efficient and cost effective manner.  Accordingly, the Creditors Notification Motion should be granted.

**(4)     Motion of the Debtors For An Administrative Order Permitting Them To Effectuate Service by Electronic Mail (the "Email Service Motion")**

81.     The Debtors have thousands of potential creditors identified on the creditor matrix prepared in connection with the commencement of these cases.  As a result, the Debtors anticipate that a large number of parties may file requests for notices in these cases under

Bankruptcy Rule 2002. Because the Debtors inevitably will be filing the vast bulk of the pleadings in these cases, service by overnight or regular mail of such pleadings on the parties on the Rule 2002 list would cost the estate substantial sums in photocopying, collating and mailing costs. By way of example, service by regular mail of a single 25-page motion (including exhibits) on a 200-person Rule 2002 list would cost the estate nearly $1,000 in photocopying and mailing costs alone. This cost, of course, would be repeated numerous times during the course of these cases. Such cost could be nearly eliminated, however, by permitting the Debtors to email pleadings to the parties entitled to notice. Email has the additional benefit that parties on the Rule 2002 list will receive pleadings from the Debtors almost immediately after they are filed, rather than having to wait several days for such pleadings to arrive by mail.

82. Accordingly, the Debtors request that they be permitted to serve pleadings in these cases by email, subject to the limitations set forth in the Email Service Motion.

**(5)** **Application Of The Debtors For An Order Authorizing And Approving The Retention Of Kurtzman Carson Consultants LLC As Notice And Tabulation Tabulation Agent For The Debtors (the "<u>KCC Retention Application</u>")**

83. Prior to retaining Kurtzman Carson Consultants LLC ("<u>KCC</u>"), the Debtors evaluated several potential candidates to serve as Notice and Tabulation Agent. Following that review, and in consideration of the number of anticipated claimants and other parties-in-interest, the nature of the Debtors' businesses and the scope of the tasks for which the Debtors will require the assistance of a claims, noticing, and tabulation agent, the Debtors believe that the appointment of KCC as Notice and Tabulation Agent is in the best interests of the Debtors' estates, their creditors, parties-in-interest, and this Court. Based on KCC's considerable experience in providing similar services in large chapter 11 cases, the Debtors believe that KCC is most qualified to serve as Notice and Tabulation Agent in these chapter 11 cases. A detailed description of the services that KCC has agreed to render and the compensation and other terms

of the engagement are provided in (a) the KCC Retention Application, (b) the affidavit of Albert H. Kass, KCC's Vice President of Corporate Restructuring Services, and (c) the KCC Engagement Letter.  I have reviewed the terms of the engagement and believe that the Debtors' estates, creditors, parties-in-interest, and this Court will benefit as a result of KCC's experience and cost-effective methods.

**B.      Motions Relating to Financing and Business Operations**

**(1)      Debtors' Motion For Interim And Final Orders (I) Authorizing The Use Of Cash Collateral, (II) Granting Adequate Protection To Certain Prepetition Secured Parties, (III) Granting Related Relief, And (IV) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001 (the "Cash Collateral Motion")**

84.      By the Cash Collateral Motion, the Debtors have requested entry of an interim order (the "Interim Order") and a final order (the "Final Order"), among other things: (a) authorizing use of cash collateral (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral"), (b) granting adequate protection to certain prepetition secured parties, (c) granting related relief, and (d)  scheduling a final hearing (the "Final Hearing") thereon.  The Interim Order is attached as Exhibit A to the Cash Collateral Motion.

85.      The Debtors require the use of the cash generated in the ordinary course of their businesses.  To the extent that any cash generated by the Debtors' businesses constitutes the Cash Collateral of any of the Lenders, the Debtors submit that such Lenders are adequately protected against diminution by (i) the Adequate Protection Liens, (ii) the allowance of any Superpriority Claims, (iii) periodic cash payments of interest at the non-default rate and (iv) the avoidance of the immediate and near-total destruction in the value of the Prepetition Security Interests that would occur should the Debtors be denied the use of the cash generated by their businesses.

86.     The Debtors do not have any currently available sources of funds to carry on the operation of their businesses other than the Cash Collateral.  The Debtors require working capital to continue their operations.  Debtors are key news media providers, and any interruption in the Debtors' ability to provide service to their customers could have a devastating impact upon the Debtors.  The uncertainty concerning the Debtors' financial condition could also greatly reduce their ability to procure goods and services from vendors critical to the successful operation of their business.

87.     If the Debtors are unable to access sufficient operating liquidity to meet their post petition obligations on a timely basis, there will be immediate and irreparable harm to their businesses and their estates (including to the Lenders themselves).  It is my understanding that the Agent, on behalf of the Lenders, has reviewed and agreed to the Debtors' proposed use of Cash Collateral in accordance with the Budget through the Termination Date.  To my knowledge the Lenders have also reviewed and approved of the Budget.  I assisted in the preparation of the Budget, and it reflects a true and accurate assessment of the finances needed by the Debtors to operate for the next thirteen week period.

88.     In light of the foregoing, the Debtors have determined, in the exercise of their sound business judgment, that they require the use of Cash Collateral for the maintenance and preservation of their property, the operation of their businesses, the payment of expenses attendant thereto and the costs and expenses of administering these chapter 11 cases.

    **(2)**    **Motion Of The Debtors For An Order (I) Approving Continued Use of Existing Cash Management Systems, (II) Authorizing Continued Use Of Prepetition Bank Accounts And Business Forms And (III) Granting Administrative Expense Status To Postpetition Intercompany Transactions (the "<u>Cash Management Motion</u>")**

    **(a)**    **Description of Centralized Cash Management System**

89.    In the ordinary course of their businesses, the Debtors utilize a centralized cash management system to collect funds from their operations and to pay operating and administrative expenses in connection therewith (the "<u>Centralized Cash Management System</u>").[4] The Centralized Cash Management System is similar to those utilized by other large, diversified companies to collect, concentrate, and disburse funds generated by numerous operating entities in a cost-effective and efficient manner.

90.    The Centralized Cash Management System is carefully managed through oversight procedures and controls implemented by the treasury department at the Debtors' headquarters in Augusta, Georgia. These oversight procedures and controls – designed to effect the collection, disbursement, and movement of cash – facilitates accurate cash forecasting and reporting and enables the Debtors to monitor capably the collection and disbursement of funds.

91.    A diagram outlining the general movement of funds within the Centralized Cash Management System is attached to the Cash Management Motion as Exhibit A (the "<u>Cash Management Chart</u>"). In addition, a list of substantially all of the Debtors' bank accounts utilized in the Centralized Cash Management System is attached to the Cash Management Motion as Exhibit B.

92.    As illustrated in the Exhibits attached to the Cash Management Motion and as discussed in greater detail below, the Centralized Cash Management System operates primarily

---

[4]    As discussed in greater detail below, both the Debtors and certain of their non-Debtor affiliates utilize the Centralized Cash Management System.

through bank accounts maintained at (a) Wachovia Bank, N.A. ("Wachovia") and (b) certain non-Wachovia local banking institutions (collectively, the "Local Depositories").[5]  In general, all revenue received by the Debtors is concentrated in one master account with Wachovia (the "Wachovia Master Account").  Revenues reach the Wachovia Master Account through a nightly sweep of 25 Wachovia sub-accounts, which are divided into Centralized Disbursement Accounts (6), Centralized Depository Accounts (4) and Field Depository Accounts (15). Revenues also ultimately reach the Wachovia Master Account through 13 non-Wachovia Field Depository Accounts maintained at the Local Depositories, which receive funds from the Debtors' local offices on account of, among other things, subscriptions, advertising and coin and currency from rack sales.  The funds in the non-Wachovia Field Depository Accounts are periodically transferred to one of the Wachovia Centralized Depository Accounts and immediately swept into the Wachovia Master Account.  A more detailed description of each of these types of accounts is set forth below.

93.      Once swept, funds are disbursed from the Wachovia Master Account to reduce debt and minimize both debt and cash balances within the system.  The Debtors generally are not an investor of excess cash balances.  Rather, cash balances are used to reduce outstanding debt, and all cash remaining in the Wachovia Master Account generates earnings credits against bank fees.

### (i)      Centralized Disbursement Accounts

94.      The Debtors process and disburse substantially all of their accounts payable and payroll obligations through six accounts maintained at Wachovia (collectively, the "Centralized Disbursement Accounts").

---

[5]      The Local Depositories generally exist in geographic locations where Wachovia has no local presence.

95.     Disbursements made from the Centralized Disbursement Accounts include, but are not limited to, (a) payments on account of payroll for employees and certain management, (b) payments on the Debtors' credit facility, (c) account transfers to non-Debtor Morris Communications Company,[6] (d) vendor account payables, (e) subscriber refunds and (f) carrier payments.

96.     In addition, one of the Central Disbursement Accounts allows authorized vendors, including the Associated Press, United States Postal Service, the Debtors' procurement card provider and various state taxing authorities, to draft funds directly by initiating an ACH transaction.  This arrangement is required by the vendor as a prerequisite to doing business with them and/or as a way the Debtors may avoid posting substantial cash deposits that otherwise would adversely impact liquidity.

### (ii)      Centralized Depository Accounts

97.     The Debtors maintain accounts for the collection of advertising and circulation revenues and revenues from other operations.  The Debtors collect revenue related to their main publishing operations primarily through four Wachovia accounts (collectively, the "<u>Centralized Depository Accounts</u>").

98.     The Centralized Depository Accounts include an in-house lockbox where a majority of advertising receipts are deposited.  Additional accounts are maintained for:  (a) credit card receipts, (b) subscription collections and (c) receiving various non-operating receipts and transfers from the other accounts maintained by the Debtors.

99.     The Centralized Deposit Accounts are swept into the Wachovia Master Account nightly.

---

[6]     "Intercompany Transfers" between the Debtors and its non-debtor affiliate are addressed more fully, *infra*.

### (iii)   Field Depository Accounts

100.   In addition to the Centralized Depository Accounts, the Debtors maintain a number of accounts (collectively, the "Field Depository Accounts") for the purpose of collecting revenues at their various publication locations.  The Field Depository Accounts are comprised of: (a) 15 accounts at Wachovia and (b) 13 accounts at the non-Wachovia Local Depositories.

101.   In particular, the Field Depository Accounts are used to collect receipts at various locations for, among other things, (a) credit cards processed locally, (b) recurring subscriber ACH and credit card charges, (c) coin and currency from racks and carriers and (d) receipts from walk-in customers and those who continue to mail payments to the local office.

102.   The Wachovia Field Depository Accounts automatically sweep to the Wachovia Master Account nightly, while the non-Wachovia Field Depository Accounts at other banks are transferred via ACH, on a daily to weekly basis depending on volume, into one of Wachovia's Centralized Depository Accounts.[7]

### (b)   Continuing Use of the Debtors' Centralized Cash Management System Is in the Best Interests of the Debtors' Estates and Creditors

103.   The Debtors seek authority to continue utilizing their Centralized Cash Management System, as described above, on a post petition basis.  It is critical that the Debtors remain able to manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate their large and complex business operations.  Substantially disrupting their current cash management procedures would impair the Debtors' ability to preserve and enhance their going concern value and to successfully reorganize during these chapter 11 cases.

---

[7]   Four of the non-Wachovia Field Depository Accounts (collectively, the "Wells Fargo Field Depository Accounts") are maintained at Wells Fargo Bank, N.A. ("Wells Fargo").  As illustrated on the Cash Management Chart, these Wells Fargo Field Depository Accounts are swept into a single master account at Wells Fargo before being transferred to a Wachovia Centralized Depository Account, as described above.

104.    The Centralized Cash Management System utilizes the Debtors' bank accounts to effectively and efficiently collect, concentrate, and disburse funds as needed in the Debtors' business operations.  The Centralized Cash Management System provides significant benefits to the Debtors, including the ability to: (a) closely track, and thus control, all corporate funds through the provision of regular status reports on the location and amount of all funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. Indeed, a disruption in the Centralized Cash Management System likely would cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to carry out their normal business operations to the detriment of employees, customers, suppliers and advertisers, and substantially increasing fees and expenses under their credit facilities.

105.    With its accounting controls, the Centralized Cash Management System also enables the Debtors to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will continue to maintain detailed records reflecting all postpetition transfers of funds.

106.    Further, the Debtors manage the Centralized Cash Management System in such a way that allows them to guard against fraud and to protect the integrity of the overall system. Over many years, the Debtors developed their treasury systems to automate reporting and calculate their cash position, and they continue to invest in the system.  Any changes to the Debtors' bank accounts or their systems that report on account activity and generate wire transfers would be extremely disruptive to the Debtors' businesses and could unwind the Debtors' efforts to create a safe and effective system.

107.    Therefore, it is both essential and in the best interests of the Debtors' respective estates and creditors that the Centralized Cash Management System be maintained.  Further, the

Debtors' reorganization efforts will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would inevitably be associated with a substantial disruption in the Centralized Cash Management System.  Accordingly, the Court should authorize the continued use of the Debtors' Centralized Cash Management System.

### (c)    Continuing Use of Prepetition Bank Accounts and Business Forms is in the Best Interests of the Debtors' Estates and Creditors

108.    The Debtors seek a waiver of the U.S. Trustee Guideline providing for closure of their existing bank accounts and requiring that new postpetition bank accounts be opened.  As described in detail above, the Debtors' bank accounts comprise an established Centralized Cash Management System that the Debtors must maintain to ensure smooth collections and disbursements in the ordinary course of their businesses.  Therefore, to avoid delays in paying obligations incurred postpetition, to ensure a smooth a transition into chapter 11, and to enhance the Debtors' efforts to successfully reorganize, the Debtors should be permitted to continue to maintain their existing bank accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.  Otherwise, transferring the Debtors' bank accounts will be disruptive, time consuming and expensive.

109.    The Debtors represent that if the relief requested herein is granted, they will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court.  For example, concurrently with the filing of this Motion, the Debtors filed motions requesting authority to pay certain prepetition obligations to employees, taxing authorities, customers and other key constituencies in the ordinary course of business.  To prevent the possible inadvertent payment of prepetition claims such as payroll checks issued prepetition, except those otherwise authorized by the Court, the Debtors will immediately advise the Cash Management Banks not to

honor checks issued prior to the Petition Date.  The Debtors will work closely with the Cash Management Banks to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.  In addition, the Debtors will implement procedures that require them to review and pre-approve (or disapprove, if appropriate) each attempted draw on the Centralized Disbursement Accounts by authorized vendors, which procedures will ensure that no unauthorized payments on account of any prepetition obligations are made.

110.    The Debtors also seek a waiver of the U.S. Trustee Guideline that would require them to replace correspondence, check and business forms (including, but not limited to, letterhead, purchase orders, and invoices) existing immediately before the Petition Date with forms referencing the Debtors' status as debtors in possession.  Parties doing business with the Debtors undoubtedly already will be aware of the Debtors' status as debtors in possession as a result of the size and publicity surrounding the cases and the notice procedures requested by the Debtors.  If the Debtors were required to change their correspondence, check and business forms, they may be forced to choose standard forms rather than the current forms with which the Debtors' employees, customers and vendors are familiar.  Such a change in operations would create a sense of disruption and potential confusion within the Debtors' organization and confusion for the Debtors' customers and vendors.  The Debtors believe that it would be very costly and extremely disruptive to cease using all existing forms and to purchase and begin using new stationery, checks and business forms – all after such forms are received, which could take substantial time and, as a result, cause significant delays.  The Debtors therefore believe that to do so would be unnecessary and that appropriate care can and will be taken to assure the proper use of the existing forms.

**(d)    The Court Should Allow Administrative Expense Status for Postpetition Intercompany Transactions**

111.    In the normal course of their businesses, the Debtors and their non-Debtor affiliates engage in various intercompany transactions.  As of any given date, there may be numerous intercompany claims (collectively, the "Intercompany Claims") that reflect intercompany receivables and payables made in the ordinary course between and among the Debtors and/or their non-Debtor affiliates (collectively, the "Intercompany Transactions"). These Intercompany Transactions include, but are not limited to:

> Centrally Billed Expenses.  In the ordinary course of business, the Debtors pay for certain centrally billed expenses, such as employee medical costs and insurance premiums, through non-Debtor Morris Communications Company, LLC ("MCC").  These charges are allocated among the Debtors and their non-Debtor affiliates and are reflected on the Debtors' intercompany books and records.

> Income Taxes.  Pursuant to a Tax Consolidation Agreement by and between Morris Publishing and non-Debtors MCC and Questo, Inc. ("Questo"), Questo files a consolidated federal and state income tax return for all of the Debtors.  Morris Publishing is responsible, on behalf of itself and its Debtor subsidiaries, for remitting the amount of tax it would have been required to pay if it were to file separate tax returns as a C corporation.  This allocation is reflected on the Debtors' intercompany books and records.

> Management Fee.    Pursuant to a Management and Service Agreement between Morris Publishing and non-Debtors MCC and MSTAR Solutions, LLC, Morris Publishing pays a fee in exchange for certain services, including, but not limited to, corporate accounting, tax, merger and acquisition, corporate communications, legal, human resources, employee benefits, audit, finance and treasury support, risk management and executive management.  Payment of this fee is reflected on the Debtors' intercompany books and records.

112.    To ensure that each individual Debtor will not fund (at the expense of its creditors) the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims against a Debtor by a non-Debtor affiliate arising after the Petition Date as a result of an Intercompany

Transaction be accorded administrative priority expense status in accordance with the Restructuring Support Agreement. If all postpetition Intercompany Claims are accorded administrative priority expense status, each entity will continue to bear ultimate repayment responsibility for such ordinary course transactions. As noted above, the Debtors maintain records of all Intercompany Transactions and, as part of their accounting practices, can ascertain, trace and account for all Intercompany Transactions between and among the Debtors and their non-Debtor affiliates. Accordingly, the Debtors believe that the relief requested should be granted.

### (e)    Other Relief

113.    Finally, the Cash Management Banks are or may be creditors of most of the Debtors. It is possible that these banks may wish to assert rights of setoff or banker's liens against monies of the Debtors held by them as of the Petition Date. The Debtors do not seek to prejudice such rights by the relief sought in the Cash Management Motion. Consequently, the Debtors request that any order granting the Cash Management Motion further provide that "to the extent a bank has a valid and enforceable right of setoff or lien in cash present in a Debtor's account at such bank at the moment of the filing of the petition commencing the chapter 11 case of such Debtor (the "Petition Date Cash"), and to the extent such cash is thereafter used by such Debtor, such bank is hereby granted (i) a replacement lien in the Debtors' cash, and such replacement lien shall be of the same extent and priority as such bank's interest, as of the filing of the petition commencing the chapter 11 case of such Debtor, in the Petition Date Cash subsequently used by the Debtors and (ii) an administrative expense claim to the extent of any diminution of Petition Date Cash after the petition commencing the case is filed." The Debtors believe that a relatively small or even *de minimis* amount of funds is subject to this relief.

     **(3)**     **Motion Of The Debtors For An Interim Order Authorizing, But Not Requiring, The Debtors To Honor Certain Prepetition Obligations To Customers And To Otherwise Continue Prepetition Customer Programs And Practices In The Ordinary Course Of Business ("Customer Programs Motion")**

114.    Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors engaged in certain practices to develop and sustain a positive reputation for their publications with subscribers and advertisers and in the marketplace generally (collectively, the "Customer Programs"). The Customer Programs are customary in the Debtors' industry and include, among other things, programs related to rebates, subscriptions, prepayments and refunds, advertiser error adjustments, certain customer services and publication delivery. The goals of the Customer Programs are to meet competitive pressures, ensure customer and advertiser satisfaction and generate goodwill for the Debtors, thereby retaining current customers and advertisers, attracting new ones and ultimately enhancing revenue and profitability.

115.    Accordingly, the Debtors seek entry of an order authorizing the Debtors, in their discretion, to (a) perform the Debtors' prepetition obligations related to the Customer Programs[8] and (b) continue to perform postpetition those Customer Programs that they believe are beneficial to the Debtors and their estates. The Debtors believe that such relief is necessary to preserve the Debtors' critical customer and advertiser relationships. Because the total operational and administrative costs to the Debtors to continue the Customer Programs is relatively insignificant when compared to the revenue that the Debtors generate from their subscribers and advertisers, the relief requested should be granted.

---

[8]    Nothing contained in the Customer Programs Motion shall constitute, nor shall it be construed as, a request to assume or adopt any executory contract related to any Customer Program. The Debtors expressly reserve all rights with respect to the continuation or cessation of any contract with any customer and the assumption, adoption, modification or rejection of any executory contract with any customer. Furthermore, the Debtors reserve the right to contest the amounts claimed to be due, if any, by any customer in the ordinary course of business.

116.    The vast majority of the Debtors' revenue comes from advertising, with the remainder coming mostly from subscriptions.  To maintain the goodwill they have developed with its most important constituent groups over the years, the Debtors have developed certain Customer Programs related to their advertisers (collectively, the "Advertiser Programs") and their subscribers (collectively, the "Subscriber Programs").  The Advertiser Programs and the Subscriber Programs are described below.

(a)    **Advertising Programs**

117.    In addition to their general obligations to place advertisements into circulation based on agreements with their advertisers, the Debtors have implemented Advertiser Programs, described in more detail below, that provide for (a) certain advertising rebates and related discounts or price adjustments (the "Rebate Program") and (b) billing adjustments related to copy and billing errors (the "Error Adjustment Program").

(i)    **The Rebate Program**

118.    In the normal course of business, the Debtors offer rebates on advertising expenditures (the "Rebates") to incentivize advertisers to purchase large volumes of print advertising from the Debtors.  These Rebates are generally provided when advertisers exceed their contract levels by a pre-determined amount (as specified in the individual contract).  The Rebate program is consistent with customary industry practice and has been employed by the Debtors for several years.

119.    The Rebates are considered earned and credited to the advertiser's account upon the expiration of the individual contract.  As of the Petition Date, the Debtors have reserved approximately $100,000 for potential liability in connection with the Rebates.  However, the Debtors believe that their actual cash liability to their advertisers with respect to Rebates will be considerably lower.

120.    In the Debtors' experience, the Rebate Program has been extremely profitable.  It provides a substantive incentive for advertisers to place increasingly large advertising orders, resulting in significantly increased revenues at almost no additional cost to the Debtors. Accordingly, the Debtors believe that the Rebate Program is critical to their ongoing business operations.

121.    The Debtors believe that failure to pay the earned Rebates and continue the Rebate program will curtail future advertising commitments and revenue.  Accordingly, the Debtors request the authority, but not direction, to continue the Rebate Program and to honor any prepetition amounts outstanding in connection therewith.

### (ii)    Error Adjustment Program

122.    Despite the Debtors' best efforts (a) advertisements occasionally contain errors or otherwise are not to the advertiser's satisfaction and (b) errors are made in connection with advertiser's invoices.  Through the Error Adjusting Program, the Debtors are able to correct these mistakes by issuing a credit to the advertiser's invoice.

123.    As of Petition Date, the Debtors had reserved approximately $100,000 for potential liability in connection with the Error Adjustment Program.  However, the cash liability to their advertisers with respect to Error Adjustment Program is expected to be significantly lower as of the Petition Date.

124.    The Debtors believe that their failure to provide credits in connection with the Error Adjustment Program would, among other things, (a) cause advertisers to short pay their accounts or withhold payment completely and (b) significantly impair the Debtors' good relationships with their advertisers, all to the detriment of the Debtors' estates and creditors. Accordingly, the Debtors believe that the Error Adjustment Program is an essential element of

their businesses and therefore request the authority, but not direction, to continue the Error Adjustment Program and to honor all prepetition obligations related thereto.

### (b)   Subscriber Programs

125.   In the normal course of business, nearly all of the Debtors' subscribers prepay for newspaper subscriptions in advance of being provided the newspapers (the "Prepaid Subscriptions").  The Debtors generally do not incur actual cash liability on account of the Prepaid Subscriptions, but instead incur the obligation to deliver the prepaid subscriptions. However, in the event a Prepaid Subscription is cancelled by a customer, in certain instances, the Debtors are obligated to return unused prepaid amounts (the "Refunds").

126.   Continuing the Debtors' practices with respect to the Subscriber Programs — specifically by honoring the Prepaid Subscriptions and issuing Refunds when appropriate — is essential to the maintenance of the Debtors' ongoing business operations.  If the Debtors were not to honor Prepaid Subscriptions or issue Refunds to subscribers who cancel Prepaid Subscriptions, the Debtors' goodwill would be severely undermined, and, consequently, the Debtors would lose subscribers and the ability to obtain new ones.  It is therefore crucial that the Debtors be able to issue such Refunds and generally perform their obligations to deliver Prepaid Subscriptions to their subscribers.

127.   As of the Petition Date, the Debtors believe that they are holding approximately $11.5 million on account of Prepaid Subscriptions.  Historically, only a *de minimus* amount of Prepaid Subscriptions have been paid to subscribers as Refunds.  Prior to the Petition Date, the Debtors averaged approximately $40,000 per month in subscriber Refunds.

128.   The Debtors request the authority, but not direction, to honor their prepetition obligations with respect to Prepaid Subscriptions and to issue Refunds for any amounts owed to customers in connection therewith, whether by check directly to the customer or through the

customers' applicable credit card company.  In addition, the Debtors request the authority to pay any outstanding processing fees to credit card companies on account of Prepaid Subscriptions.[9]

129.    To preserve the value of the Debtors' businesses, the Debtors must be permitted, in their sole discretion, to continue honoring or paying all Customer Programs without interruption or modification.  Accordingly, the Customer Programs Motion should be granted.

### (4)    Motion Of The Debtors For An Interim Order Authorizing, But Not Directing, The Payment Of Certain Prepetition Sales, Use, Franchise And Property Taxes, Licensing Fees, And Similar Obligations ("Tax Motion")

130.    In the ordinary course of business, the Debtors incur certain sales, use, franchise and/or real and personal property taxes, fees for licenses and reporting, and other similar charges and assessments (collectively, the "Taxes") that are payable to various state and local taxing authorities (collectively, the "Taxing Authorities") as such payments become due.[10]  The Debtors have facilities and operations located throughout the United States; accordingly, they are subject to the payment of Taxes to numerous Taxing Authorities located throughout the country.

131.    Although the Debtors believe that they are current on all of their Taxes that have become due as of the Petition Date, because many of such Taxes are paid on a periodic basis (and in arrears), there may be in many instances a lag between the time when the Debtors incur

---

[9]    Because credit card transactions and associated fees are settled daily, a small amount of processing fees likely will be outstanding as of the Petition Date.  Absent payment of this small amount, the credit card services could be disrupted, and the credit card companies could require the Debtors to post deposits as a condition of processing transactions uninterrupted.

[10]    Pursuant to that certain Amended and Restated Tax Consolidation Agreement effective as of January 6, 2010 (the "Tax Agreement"), by and between Morris Publishing, Morris Communication Company, LLC ("MCC"), MPG Newspaper Holding, LLC ("MPG Holding"), Shivers Trading & Operating Company ("Shivers") and Questo, Inc. ("Questo"), Questo, a non-debtor, files a consolidated federal income tax return that includes Morris Publishing and all of the Debtors.  Pursuant to the Tax Agreement, Morris Publishing is responsible, on behalf of itself and its subsidiaries, for making payment to MPG Holding, Morris Publishing's non-debtor parent company, (a) the amount of tax Morris Publishing would have been required to pay if it were to file separate federal tax returns as a C corporation and (b) any state or local income, franchise or other tax for which Questo has filed a consolidated or combined return on behalf of Morris Publishing or the Debtor subsidiaries.  Accordingly, the Debtors request authority to pay any unpaid Taxes to MPG Holding, as opposed to the Taxing Authority, pursuant to the terms of the Tax Agreement.

an obligation to pay the Taxes and the date such Taxes become due and payable. Various Taxing Authorities may therefore have claims against the Debtors for Taxes that have accrued but remain unpaid as of the Petition Date, and for certain other Taxes that will come due during the pendency of these cases.

132.    The Debtors seek authority, in their discretion, to pay the relevant Taxing Authorities any Taxes that have accrued, but were not yet due and owing or were not paid in full, as of the Petition Date. The Debtors estimate that as of the Petition Date, their accrued and unpaid liabilities for Taxes include approximately $310,000 in sales and use taxes, $600,000 in personal property taxes, $850,000 in real property taxes, and $25,000 in other, similar tax obligations. The Debtors seek to pay such Taxes up to the estimated amounts specified herein plus additional amounts, if necessary, up to 25% beyond the foregoing estimates (the "Cap"). Although the Debtors believe that their estimates have been accurately and completely prepared, permitting total payments on account of such prepetition Taxes up to 125% of their estimated amount will permit the Debtors to pay most or all additional tax liabilities that may be identified while limiting or eliminating the need to secure further Court approvals for payment of such amounts.

133.    In addition, the Debtors are subject to certain audit investigations and may be subject to further audit investigations (the "Audits") during the pendency of these cases that may result in prepetition Taxes (the "Audit Amounts"). The Debtors seek authority, in their discretion, to satisfy any such Audit Amounts in the ordinary course of business.

134.    Payment of the Taxes as requested by the Tax Motion will prevent disruption of the Debtors' businesses as they enter these chapter 11 cases. In certain cases, as described in the Tax Motion, some Taxing Authorities may audit the Debtors if such Taxes are not timely paid. The Debtors believe that such Audits would needlessly divert the Debtors' attention from their

reorganization efforts. In addition, like unpaid property taxes, some Taxing Authorities also may seek to impose liens on the Debtors' assets on account of unpaid "trust fund" Taxes, which liens would require time, effort and expense for the Debtors to challenge and remove. An improper lien or the failure to pay certain Taxes also might affect the Debtors' good standing in a particular state, potentially affecting the Debtors' ability to continue operating in the ordinary course. The Debtors believe that timely payment of the Taxes is necessary to avoid such distractions and is thus in the best interests of the Debtors and their estates.

135.    In addition, to the extent that any "trust fund" taxes remain unpaid by any of the Debtors, their officers could be subject to civil liability or criminal prosecution during the pendency of these chapter 11 cases. The possibility of any such lawsuit or criminal prosecution would distract the Debtors and their officers in their effort to implement a successful reorganization strategy, all to the detriment of all parties-in-interest.

136.    The Debtors further believe that, among other things, their successful reorganization will require good standing within the states in which they do business and a complete devotion of effort by their officers and directors to these cases. If any of the Taxing Authorities attempt to exercise certain remedies against the Debtors, it would have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important task of the Debtors' successful reorganization. For these reasons, the Debtors believe that if the relief requested in the Tax Motion is not granted, the tax obligations described above would cause the Debtors' estates immediate and irreparable harm by detracting from, and potentially derailing, their reorganization efforts.

**(5)** **Motion For An Interim Order Authorizing: (A)** **Payment Of Prepetition Employee Wages, Salaries, And Other Compensation; (B)** **Reimbursement of Prepetition Employee Business Expenses; (C)** **Payments For Which Prepetition Payroll And Tax Deductions Were Made; (D)** **Contributions To Prepetition Employee Benefit Programs; (E)** **Payment To Third Parties Of All Costs And Expenses Incident To The Foregoing Payments And Contributions; And (F)** **Applicable Banks And Other Financial Institutions To Honor And Pay All Checks And Transfers Drawn On The Debtors' Payroll Accounts To Make The Foregoing Payments (the "**<u>Employee Benefits Motion</u>**")**

137.    As noted above, the Debtors currently employ approximately 1,844 full-time and 339 part-time employees (the "<u>Employees</u>").

138.    The Employees' skills, knowledge, and understanding of the Debtors' businesses are the Debtors' most valuable asset.  Without the continued services of the Employees, an effective reorganization of the Debtors will not be possible.

139.    To preserve their most valuable assets, to minimize the personal hardship that the Employees will suffer if prepetition employee-related obligations are not paid when due or as expected, and to maintain morale and an essential workforce during this critical time, the Debtors, by the Employee Benefits Motion, seek authority, in accordance with their stated policies, to:  (a) pay all prepetition wages, salaries, and other compensation owed to the Debtors' Employees, subject to specified caps; (b) reimburse all prepetition business expenses to Employees, subject to specified caps; (c) make all payments for which prepetition payroll and tax deductions were made, subject to specified caps; (d) contribute to prepetition employee benefit programs, subject to specified caps; (e) pay all third-party costs relating to the foregoing payments and contributions; and (f) authorize and direct applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments (collectively, and as more fully described below, the "<u>Employee Wages and Benefits</u>").  In effectuating the relief sought by the Employee Benefits Motion, the

Debtors shall not pay more than 25% in excess of each of the estimated amounts of the following outstanding prepetition obligations that are defined or described below in the Employee Benefits (hereinafter, the "Cap").

(a)    <b>Wages, Salaries, and Other Compensation</b>

140.    The Debtors' average gross monthly compensation for their Employees' wages is approximately $5.4 million ("Wages").  Approximately 95% of payroll payments are made by direct deposit through electronic transfer of funds directly to the Employees, and the remaining Employees are paid via check.  Most Employees are paid one week in arrears on a bi-weekly basis (each a "Pay Day").

141.    Because most of the Debtors' Employees are paid in arrears, as of the Petition Date, some of the Debtors' Employees have not been paid all of their prepetition wages. Additionally, compensation may be due and owing as of the Petition Date because some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

142.    As of the Petition Date, the aggregate amount of accrued wages (excluding the Payroll Taxes and Deductions) earned prior to the Petition Date that remains unpaid to the Debtors' Employees is approximately $2 million (the "Unpaid Wages").  By the Employee Benefits Motion, the Debtors request the authority to pay all such Unpaid Wages to their Employees in the ordinary course of business, subject to the Cap.  The Debtors have made careful inquiries and have taken diligent steps to ensure that their Employees are not owed more than $10,950 for Unpaid Wages as of the Petition Date.  Accordingly, if the Employee Benefits Motion is granted, the Debtors are confident that no Employee will be paid more than $10,950 for such Unpaid Wages.

**(b)    Reimbursable Expenses**

143.    Prior to the Petition Date, the Debtors provided a corporate credit card (a "<u>Procurement Card</u>") to all employees who would be required to incur business-related expenses in the ordinary course of business.  All expenses billed to the Procurement Cards are billed directly to and paid by Morris Publishing in the ordinary course of business.

144.    However, in addition to the expenses billed to the Procurement Card, Employees may incur additional expenses on behalf of the Debtors in the scope of their employment that are not covered by the Procurement Card (the "<u>Reimbursable Expenses</u>").  The Reimbursable Expenses include, but are not limited to, mileage driven for business travel (reimbursed at $.385/mile) and cellular phone service.

145.    While most business related expenses are paid through the use of the Procurement Cards, Reimbursable Expenses are incurred on behalf of the Debtors by Employees through use of their personal funds or credit cards.  In the normal course of business, after submission and approval of expense reports, such Employees are reimbursed through the regular bi-weekly payroll process.

146.    The Employees incur an average of approximately $160,000 on mileage, $10,000 on cellular phone service and $5,000 in "other" Reimbursable Expenses every month.  Accordingly, the Debtors estimate that as of the Petition Date, approximately $85,000 in Reimbursable Expenses have been incurred but remain unpaid.

147.    The Reimbursable Expenses all were incurred on the Debtors' behalf and with the understanding that they would be reimbursed.  To preserve the relationships they enjoy with their Employees at this critical time, and to avoid harming the individual Employees who incurred the Reimbursable Expenses on their behalf, the Debtors request authority to pay all unpaid

Reimbursable Expenses that accrued prepetition or relate to the prepetition period, subject to the Cap.

### (c)    Paid Time Off

148.    The Debtors pay the Employees for six holidays per year.  The Debtors also offer their Employees other forms of compensation, including vacation pay, paid sick time and other earned time off ("Paid Time Off").  These forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified employees to operate their business.

149.    Paid Time Off ranges from 17 to 27 days per year, according to years of service. The Employees receive Paid Time Off on January 1 of each year to use during that year.  For most Employees, Paid Time Off is forfeited on December 31, of each year if not used before then.

150.    The Debtors seek authority to honor, in the ordinary course of business, all liabilities to their Employees that arose under their holiday and Paid Time Off policies or practices prior to the Petition Date.  The Debtors anticipate that most Employees will utilize their accrued Paid Time Off in the ordinary course of business and that there is not likely to be any material cash flow requirements beyond the Debtors' normal payroll obligations.

### (d)    Tax Withholdings, Payroll Taxes and Deductions

151.    The Debtors are required by law to withhold from an Employee's wages amounts related to, among other filings, federal, state and local income taxes, and social security and Medicare taxes (collectively, the "Tax Withholdings") for remittance to the appropriate federal, state or local taxing authorities.  The Debtors must then match, from their own funds, for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Tax Withholdings, the "Payroll Taxes").

152.    The Debtors' current monthly Payroll Taxes total approximately $2 million.  The Debtors' Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authorities at the same time Employee payroll checks are administered.  As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes will be approximately $1.4 million.

153.    The Debtors seek authority to honor and process the prepetition obligations with respect to the Payroll Taxes, including forwarding the Tax Withholdings, subject to the Cap.

154.    Additionally, and during each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks (collectively, the "Deductions"), including, without limitation, (a) garnishments, child support, charitable and similar Deductions and (b) other pre-tax and after-tax Deductions payable pursuant to certain of the benefit plans offered to the Employees (such as an Employee's share of health care benefits or insurance premiums, long term disability, 401k contributions, flex spending accounts and voluntary life insurance) (collectively, the "Employee Benefit Programs")[11] and forward those Deductions (with the exception of any amounts owing on account of self-insured programs) to a third party pass through entity (the "Pass Through Entity") for ultimate payment to the benefit provider.[12]

---

[11]    One such Employee Benefit Program the Debtors seek to honor is the provision of subsidized insurance premiums for former employees, pursuant to the recently enacted American Recovery and Reinvestment Act of 2009 (the "2009 Act").  Under the 2009 Act, qualifying employees involuntarily separated from their employment may maintain post-termination health coverage through COBRA (the 1986 Consolidated Omnibus Budget Reconciliation Act) by paying only 35% of the applicable group plan premium.  The former employer, in turn, recoups this subsidy by claiming a credit on its payroll tax return.  Thus, this Employee Benefit Program is, ultimately, a $0 transaction for the Debtors.

[12]    To obtain the best possible rates, the Debtors do not directly pay the Deductions to the ultimate benefit provider.  Instead, under the Employee Benefit Programs, a non-Debtor parent corporation serves as the Pass Through Entity that (a) negotiates the terms of the Employee Benefit Program and (b) seeks reimbursement of an allocated share of the premiums and costs associated with the Employee Benefit Programs from the Debtors and certain non-Debtor affiliates.  Through the Employee Benefit Programs, the Pass Through Entity is able to obtain steep discounts that its subsidiaries — including the Debtors — could not obtain on their own.

155.     On average, the Debtors historically have withheld approximately $1.6 million in Deductions from the Employees' paychecks per month.  As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding Deductions was approximately $800,000.

156.     Accordingly, the Debtors seek authority to forward these prepetition Deductions to the applicable third party recipients including, but not limited to, the Pass Through Entities, subject to the Cap.

### (e)      Costs and Expenses Incident to Employee Payments

157.     By their Employee Benefits Motion, the Debtors request authority to pay all costs incident to, among other items, the Unpaid Wages, Reimbursable Expenses, Vacation Time, the Sick Days, the Payroll Taxes and the Deductions, including other processing costs or administration costs ("Prepetition Processing Costs").  The Debtors estimate that the aggregate amount of Prepetition Processing Costs accrued but unpaid as of the Petition Date constitutes a *de minimis* amount.  Payment of the Prepetition Processing Costs is justified because the failure to pay any such amounts might disrupt services of third party providers with respect to these Employee Wages and Benefits.

158.     The Debtors seek the relief requested in the Employee Benefits Motion because any delay in paying any of the Employee Wages and Benefits could severely disrupt the Debtors' relationship with their Employees and dedicated non-Employee personnel and irreparably impair the Employees' morale at the very time that their dedication, confidence, and cooperation are most critical.  The Debtors face the risk that their operations may be severely impaired if the Debtors are not immediately granted authority to pay the Employee Wages and Benefits.  At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would result from any decline in workforce morale attributable to the Debtors' failure to pay the Employee Wages and Benefits in the ordinary course of their businesses.

159. If the relief requested in the Employee Benefits Motion is not granted, the Employees would suffer hardship and, in many instances, financial difficulties, since these funds are needed to enable them to meet their personal obligations. In addition, without the requested relief, the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment. Accordingly, the Employee Benefits Motion should be granted.

**(6)      Motion Of The Debtors For An Interim Order Authorizing The Debtors To (I) Continue Prepetition Insurance Policies And (II) Pay All Prepetition Obligations In Respect Thereof ("Insurance Motion")**

160. In connection with the day-to-day operations of their businesses, the Debtors require the maintenance of various insurance policies (as set forth on a non-exhaustive list attached to the Insurance Motion as Exhibit A,[13] the "Insurance Policies") through several different insurance providers (the "Insurance Providers"). Because the Debtors have significant business operations, the Insurance Policies cover a variety of matters such as general liability, employment liability, workers' compensation, property, and travel, among others.[14]

161. To obtain the best possible rates for these policies, the Debtors do not directly pay premiums. Instead, the Debtors participate in a program (the "Insurance Policy Program")

---

[13]     Due to the size, complexity and number of business units that the Debtors operate, it is possible that certain of the Debtors' Insurance Policies may have been inadvertently omitted from the list of Insurance Policies attached to the Insurance Motion as Exhibit A. Accordingly, Exhibit A represents a potentially non-exhaustive list of Insurance Policies, and the Debtors reserve the right, pursuant to the terms and conditions of the Insurance Motion and without further order from the Court, to amend Exhibit A to add any Insurance Policies that were omitted therefrom and to request that the relief requested in the Insurance Motion apply equally to all such policies. In the event the Debtors add any Insurance Policies to Exhibit A, the Debtors will serve the Insurance Motion, any order approving same, and a revised version of Exhibit A upon the issuer(s) of any such Insurance Policy or Policies, the Office of the United States Trustee, and any official committee(s) appointed in the Debtors' chapter 11 cases.

[14]     In addition to the Insurance Policies listed in Exhibit A, the Debtors maintain numerous insurance policies with respect to, among other things, employee health, dental, disability, and life insurance benefits. These policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' employee benefits programs.

whereby a non-Debtor parent corporation (the "Policy Holder")[15] (a) purchases the Insurance Policies and (b) seeks reimbursement of an allocated share of the costs associated with the premiums from the Debtors and any non-Debtor affiliates who also are beneficiaries under the Insurance Policies.

162.    Through the Insurance Policy Program, the Policy Holder is able to obtain steep, multiple-policy discounts that its subsidiaries — including the Debtors — could not obtain on their own.  Accordingly, the Insurance Policy Program represents the most cost effective way for the Debtors to obtain needed insurance coverage.

163.    The Insurance Policy Program also provides other benefits to the Debtors.  For example, it allows the Debtors to spread the risk of any catastrophic loss — and the attendant risk of increased claims and premiums — among a much larger group than its own.  Thus, historically, the Debtors' insurance costs have been low.  In addition, the Debtors are not required to post any letters of credit or other security with the Insurance Providers because the Policy Holder bears that obligation under the Insurance Policy Program.  Thus, the Debtors are able to improve their liquidity through this arrangement.

164.    Since the inception of this arrangement, the Policy Holder has implemented a number of procedures to ensure that insurance costs are allocated appropriately amongst its subsidiaries and that the Debtors are not bearing the burden of insurance it does not use.  Among other things, the Policy Holder implements allocation rules designed to closely approximate the relative costs of insurance that is shared by the Debtors and non-Debtor affiliates.  For example:  (a) workers' compensation costs are allocated by each insured party's percentage share

---

[15]        In most cases, the Policy Holder purchasing the Insurance Policy is Questo, Inc. ("Questo").  In others, the Policy Holder is Morris Communications Company, LLC ("MCC") or Shivers Trading & Operating Company ("Shivers").  Each of Shivers, MCC and Questo are current or former parents of each of the Debtors.

of the total labor cost; (b) general liability insurance costs are allocated to each entity by their percentage share of total revenues; (c) employment practice liability insurance costs are allocated by numbers of employees; (d) auto liability insurance costs are allocated by numbers of vehicles; and (e) property insurance costs are allocated by percentage of total property values.  These allocation rules are applied rigidly to ensure that the Debtors receive their fair share of the overall benefit of the reduced premiums associated with the Insurance Program.

165.    Nearly all premiums under the Debtors' Insurance Policies are paid by the Policy Holder at the policy's inception.  In addition, those Insurance Policies under which premiums are paid in monthly installments are paid in full by the Policy Holder.  The Debtors have paid their allocated share of the insurance premiums for the current month prior to the Petition Date. Accordingly, the Debtors believe that they have satisfied their prepetition financial obligations with respect to those Insurance Policies.  Out of an abundance of caution, however, in order to prevent any disruption of the Debtors' Insurance Policies and any attendant harm to the Debtors' businesses that such disruption would cause, the Debtors seek authorization, but not the direction, to make any prepetition payments to the Policy Holder under the Insurance Program as necessary and to perform any other prepetition obligations that may be necessary to maintain the Insurance Policies.

166.    The Debtors have compelling business reasons for seeking to maintain their Insurance Policies in force.  The insurance coverage provided under the Debtors' Insurance Policies are essential for preserving the Debtors' businesses, property, and assets, and, in many cases, such coverage is required under the Debtors various loan documents and by various regulations, laws, contracts and other authorities that govern the Debtors' business — including U.S. Trustee operating guidelines.  If the Debtors did not continue to perform their obligations under the Insurance Program, their coverage under the Insurance Policies could be voided.

Disruption of their insurance coverage would expose the Debtors to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Providers under the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Insurance Policies; (c) the possible loss of good-standing certification to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (d) the possible inability to obtain similar types of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.[16]   Any or all of these consequences would be seriously harmful to the Debtors' business and restructuring efforts, as they would expose the Debtors to higher costs and increased risks of loss at a minimum.  To avoid those consequences, the relief requested in the Insurance Motion should be granted.

**(7)    Motion For An Interim Order And A Final Order Pursuant To Sections 105(a) And 366 Of The Bankruptcy Code (I) Prohibiting Utility Providers From Altering, Refusing, Or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured Of Future Performance, And (III) Establishing Procedures For Determining Adequate Assurance Of Payment ("Utility Motion")**

167.    In connection with the operation of their business and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other services, water, sewer, electricity, gas, local and long-distance telecom, data, fiber transmission, and other similar services (collectively, the "Utility Services").  On a monthly basis, the Debtors historically have spent an average of approximately $500,000 for the various Utility Services.

---

[16]    Nothing contained in the Insurance Motion is intended or should be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any claim, or (c) an approval or assumption of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

These Utility Services are provided by approximately 115 Utility Providers nationwide, with which one or more of the Debtors may have multiple utility accounts. A potentially non-exhaustive list of the Utility Providers is attached to the Utility Motion as Exhibit A.[17]

168.    Uninterrupted Utility Services (as defined) are essential to the Debtors' ongoing operations and the success of the Debtors' reorganization efforts. A disruption of the Utility Services at any of the Debtors' facilities likely would be costly to the Debtors and harmful to their businesses, as the Debtors would be forced from the outset of these chapter 11 cases to focus on finding replacement Utility Providers and Services, if any such replacements exist, rather than focusing on the operation and restructuring of their business. Moreover, the business disruption that likely would result from interruption of the Utility Services would damage customer relationships, revenues and profits and would adversely affect the Debtors' restructuring efforts, all to the detriment of their estates, creditors, and employees. Thus, it is critical that Utility Services to the Debtors continue uninterrupted.

169.    The Debtors intend to pay all postpetition obligations to the Utility Providers in a timely manner, consistent with the ordinary course of operating their businesses postpetition. The Debtors further propose to make the Adequate Assurance Deposit, as described in the Utility Motion. As a result, the Debtors do not believe that any Utility Provider should require assurance of payment beyond that afforded by the Adequate Assurance Payment.

---

[17]    While the Debtors have exercised their best efforts to list all of their Utility Providers and account numbers in Exhibit A, it is possible that certain Utility Providers and/or account numbers may have been omitted from this list. The Debtors reserve the right to amend Exhibit A to add any Utility Providers and/or account numbers that were omitted therefrom and request that the relief requested in the Utility Motion apply equally to all such omitted entities and accounts. Furthermore, the relief requested in the Utility Motion shall apply to all of the Debtors' accounts with every Utility Provider listed in Exhibit A regardless of whether or not such accounts are contained in Exhibit A. In addition, the Debtors reserve the right to argue that any of the entities now or hereafter listed in Exhibit A are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code and, therefore, are not subject to the terms of the relief requested in the Utility Motion.

**(8)    Motion for Authority to (a) Pay Allowed Unimpaired Claims of General Unsecured Creditors in the Ordinary Course of Business and (b) Direct Banks and Other Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief ("<u>Unimpaired Claims Motion</u>")**

170.    The Debtors disburse approximately $5.6 million per month to operate their businesses in the ordinary course (excluding payroll and other employee expenses and statutory obligations).   Of this amount, the Debtors estimate that approximately $2 million would constitute Unimpaired Claims (<u>i.e.</u>, costs of the Debtors' operations that accrued prior to the Petition Date, remained unpaid as of the Petition Date, and which will become due in the ordinary course on or after the Petition Date).   Cash maintained by the Debtors and the cash generated in the ordinary course of business will provide sufficient liquidity for payment of the Unimpaired Claims.

171.    The Debtors request authority to pay, as they become due in the ordinary course of business, all of the Debtors' fixed, liquidated, noncontingent, and undisputed prepetition unsecured claims, other than payments to the holders of the Old Notes, which claims are unimpaired under the Plan (the "<u>Unimpaired Claims</u>").   The Unimpaired Claims include, without limitation, claims of the Debtors' (a) newsprint suppliers, (b) printing process vendors, (c) haulers, (d) carriers, (e) the USPS and (f) specialized printers (collectively, with all other holders of Unimpaired Claims, the "<u>Unimpaired Claimants</u>").   Further, the Debtors request that they be authorized to compel repayment from those Unimpaired Claimants who cease to honor Customary Trade Terms (defined herein) or such other trade terms as are agreed to with the Debtors.

**(a)    Newsprint Suppliers and Printing Process Vendors.**

172.    Newsprint constitutes the principal raw material used by the Debtors to complete the printing of their various publications.   The price of newsprint historically has been volatile,

and the consolidation of North American newsprint mills over the years has reduced the number of newsprint suppliers which, over the last year, has created increases in newsprint prices. The Debtors believe that a failure to pay the newsprint suppliers (collectively, the "Newsprint Suppliers") on a timely basis could negatively impact their existing relationships with them and, therefore, could adversely impact the Debtors' newsprint prices in the future. The Debtors further believe that, due to recent market downturns in the newsprint industry, any failure to pay the Newsprint Suppliers promptly may severely impact the financial condition of the Newsprint Suppliers. Moreover, if the Newsprint Suppliers fail to supply newsprint to the Debtors continuously and promptly, the Debtors' business operations would be disrupted significantly.

173. In addition to newsprint, the Debtors' ability to complete the printing of their various publications is dependent on several other printing process materials. For example, the Debtors' printing process is heavily reliant on a continuous ink supply and a sufficient inventory of custom-fit newspaper plates to ensure that ink images can be successfully transferred to newsprint. Each of these printing process materials is essential to the production of the Debtors' publications. Further, several of the printing process materials are customized to fit the Debtors' needs and, as a result, are purchased by the Debtors from a single or limited number of suppliers (collectively, the "Printing Process Vendors"). Due to the critical nature of the continuous supply of these materials to the production of the Debtors' publications, it is essential to the Debtors' reorganization efforts that the delivery of these printing process materials continues without any delay.

174. The Debtors estimate that approximately $500,000 in Unimpaired Claims will have arisen as of the Petition Date on account of the Unimpaired Claims of Newsprint Suppliers and Printing Process Vendors that provide necessary goods and services to the Debtors. The Debtors may be forced to shut down their operations in the event of a supply or service

disruption.  Not only would the Debtors have squandered goodwill that they have developed with their customer base resulting from the adverse ripple effect caused by the disruption in the Debtors' businesses, any potential distribution to creditors could be diluted by claims asserted by the Debtors' customers on account of the Debtors' failure to timely produce its various publications.  If that were to happen, the interests of all creditors and parties in interest in these chapter 11 cases could be impaired severely.  In order to avoid this immediate and irreparable harm to the Debtors' estates, the Debtors submit that payment of the  Unimpaired Claims of the Newsprint Suppliers and Printing Process Vendors, on an ongoing post petition basis, is necessary and appropriate in these cases.

### (b)       Shippers, Warehousemen and Customs and Duty Claimants.

175.    The Debtors' business operations involve the production and distribution of multiple publications.  The Debtors utilize a number of third parties on a daily basis to ensure that newspapers ultimately reach the Debtors' subscribers and other readers, as described in more detail below.

176.    *First*, the Debtors frequently utilize reputable third-party common carriers and truckers (collectively, the "Haulers") to transport completed publications and supplies to and from the Debtors' printing facilities and distribution centers.

177.    *Second*, the Debtors utilize the services of approximately 1,500 independent contractors (the "Carriers") to deliver their publications from its distribution centers to subscribers' homes.  The Carriers are divided between those who are paid "per throw" (with the "per throw" price based on, among other things, the geographic location of the route) and those who are paid based on the difference between their contracted wholesale rate and the amounts collected from subscribers.

178.    *Third*, the USPS is responsible for delivering certain of the Debtors' publications to the Debtors' customers.[18]

179.    The Haulers, the Carriers and the USPS provide services to the Debtors in the ordinary course of business.  As an integral part of their business operations, the Debtors rely on the Haulers to transport its finalized publications from their printing facilities to their distribution centers and on the Carriers and the USPS to transport several hundred thousand copies of their publications from the distribution centers to subscribers.[19]  If the deliveries from the Haulers, the Carriers and the USPS are interrupted, the Debtors will be unable to deliver their publications to their subscribers.  Any such delay would not only jeopardize the Debtors' ability to satisfy their obligations to their subscribers, but could, in turn, endanger the Debtors' ability to meet the audience base expectations of various advertisers who purchase advertisements in the Debtors' publications.

180.    It is estimated that, as of the Petition Date, the Debtors' will owe (a) approximately $40,000 to Haulers, (b) approximately $550,000 to Carriers and (c) approximately $35,000 to the USPS.

### (c)    Specialized Magazine Printers.

181.    Certain printers, including RR Donnelley ("RRD") and Walton Press ("Walton"), are responsible for printing several of the Debtor's magazines, including *Skirt!*.  These printers (collectively, the "Specialized Magazine Printers") are in a unique position to continue to print

---

[18]    Prior to the Petition Date, the USPS had the ability to, in lieu of requiring deposits, draw directly from one of the Debtors' accounts via automated clearing house on account of the numerous postage machines the Debtors use across the country.  Without the ability to pay the prepetition amounts owed, the USPS likely would require the Debtors to post substantial deposits, causing potential delivery delays, at a time when the Debtors' need to (a) conserve cash to administer its bankruptcy estate and (b) demonstrate that business will continue as usual to maintain customer confidence and loyalty.

[19]    In some markets, Haulers also act as Carriers.

the Debtors' magazines, which require specially designed printing plates to accommodate the size and layout of the publications.  The Debtors would be unable to find replacements for the Specialized Magazine Printers quickly or without great expense.

182.    Failure to pay the Specialized Magazine Printers on account of their prepetition amounts owed could mean a delay in printing of several of Debtors' publications, which would result in, among other things, (a) a disruption in service to the Debtors' customers and (b) a breach of agreements with advertisers who utilize placement in these publications.

183.    These consequences would disrupt the Debtors' operations at a time when it is critical for them to focus on customers and advertisers — the Debtors' primary sources of revenue.  As such, it would be in the interests of the Debtors, their creditors and these estates to pay the Specialized Magazine Printers on account of their prepetition amounts owed.

184.    The Debtors estimate that the amount owing to the Specialized Magazine Printers on account of prepetition obligations is, collectively, $125,000.

### (d)    Payment of Unimpaired Claims in the Ordinary Course of Business Will Allow the Debtors to Receive Customary Trade Terms

185.    In exchange for payment of the Unimpaired Claims, the Debtors will, in their business judgment and as applicable, seek agreements from the Unimpaired Claimants receiving payment on their Unimpaired Claims to continue supplying goods and/or services to the Debtors on terms that are at least as favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Debtors and each Unimpaired Claimant at any time in the three months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Unimpaired Claimant.  The Debtors also reserve the right to negotiate new trade terms with any Unimpaired Claimant as a condition to any payment.

186. The Debtors believe that circumstances may arise in which they should be entitled to recover payments made to the Unimpaired Claimants. If an Unimpaired Claimant ceases to honor Customary Trade Terms, or such other trade terms as are agreed to with the Debtors, any payment made to such Unimpaired Claimant hereunder should be deemed an avoidable post petition transfer under Section 549 of the Bankruptcy Code, recoverable by the Debtors in cash upon written request. Upon such recovery, the Unimpaired Claim for which such payment initially was made shall be deemed to be reinstated as an Unimpaired Claim in the amount so recovered. In the event that an Unimpaired Claimant refuses to issue the repayment upon written request, the Debtors propose that they be authorized to compel such repayment by a motion in this Court.

187. In light of the prepackaged nature of these chapter 11 cases, the Debtors expect to emerge from chapter 11 on an expedited basis. Moreover, payment of the Unimpaired Claims in the Debtors' ordinary course of business is contemplated by the Plan. The Plan, a product of extended and good faith negotiations, is based on the primary negotiating parties' own desire to minimize disruption in the Debtors' businesses and maximize their enterprise values by providing full payment to the Unimpaired Claimants in the ordinary course of business. Given that these allowed claims are unimpaired as part of the proposed Plan, approval of this Motion merely affects the timing of such payments and not the ultimate recovery of any creditors.

188. Accordingly, the Debtors respectfully submit that payment of the Unimpaired Claims in the ordinary course of business is especially appropriate here as the satisfaction of such claims is already a key feature of the Debtors' reorganization, necessary to preserve the value of their businesses, and will ease the Debtors' administrative burden and risk of business interruption during the very limited period pending confirmation.

I believe that the commencement of these chapter 11 cases is in the best interests of the Debtors' stakeholders and other parties-in-interest.  As they did during the prepetition period, the Debtors, with the assistance of their professionals, will work diligently to maintain and enhance the going concern value of the companies while pursuing their reorganization strategy.


                                                        /s/ Steve K. Stone
                                                        Steve K. Stone
                                                        Senior Vice President and
                                                        Chief Financial Officer
                                                        Morris Publishing Company, LLC

Sworn to and subscribed before me
this 19th day of January, 2010.


  /s/ Brenda J. Jennings
Notary Public