## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MORRIS PUBLISHING GROUP, LLC, et al.,[1] | Case No. 10-_____ |
| Debtors. | Joint Administration Requested |

## MOTION FOR AUTHORITY TO (A) PAY ALLOWED UNIMPAIRED CLAIMS OF GENERAL UNSECURED CREDITORS IN THE ORDINARY COURSE OF BUSINESS AND (B) DIRECT BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move this Court (the "Motion") for entry of an Order authorizing, but not requiring, the Debtors to pay certain allowed unimpaired claims of general unsecured creditors in the ordinary course of business. The facts and circumstances supporting this Motion are set forth in the concurrently filed Affidavit of Steve K. Stone in Support of First Day Motions (the "Stone Affidavit"). In further support of the Motion, the Debtors respectfully state as follows:

### STATUS OF THE CASE AND JURISDICTION

1. On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Morris Publishing Group, LLC (9462); Athens Newspapers, LLC ("Athens") (3084); Broadcaster Press, Inc. (3275); Homer News, LLC ("Homer") (8613); Log Cabin Democrat, LLC ("Log Cabin") (5012); Morris Publishing Finance Co. (3044); MPG Allegan Property, LLC (5060); MPG Holland Property, LLC (5060); Southeastern Newspapers Company, LLC (5156); Southwestern Newspapers Company, L.P. (1328); The Oak Ridger, LLC (5060); The Sun Times, LLC ("Sun Times") (2529); Yankton Printing Company (8120); Stauffer Communications, Inc. (0047); and Florida Publishing Company (8216). Athens's address is One Press Place, Athens, Georgia 30603. Homer's address is 3482 Landings Street, Homer, Alaska 99603. Log Cabin's address is 1058 Front Street, Conway, Arkansas 72033. Sun Times's address is 104 S. Railroad Street, Ridgeland, South Carolina 29936. All other Debtors maintain an address at 725 Broad Street, Augusta, Georgia 30901.

(the "Bankruptcy Code").   On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief.

2.     The Debtors are continuing in possession of their respective properties and are continuing to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     No request has been made for the appointment of a trustee or examiner and no official committee has yet been established in these cases.

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND OF THE DEBTORS

5.     Debtor Morris Publishing Group, LLC ("Morris Publishing") is part of a private media business that has been owned and operated by the William S. Morris III family for three generations.  Morris Publishing was formed in 2001 to assume the newspaper operations of its former parent, Morris Communications Company, LLC.  The Debtors own and operate 13 daily newspapers and more than three dozen nondaily newspapers in the Southeast, Midwest, Southwest and Alaska, as well as city magazines and free community publications.

6.     Newspapers form the Debtors' core business unit.  Their daily and nondaily newspapers have a total combined circulation of more than 450,000.  The Debtors have a concentrated presence in the Southeast, with four signature holdings, including the *Florida Times-Union (Jacksonville)*, the *Savannah Morning News*, the *Athens Banner-Herald* and the *Augusta Chronicle*, their original and flagship newspaper.  The Debtors' daily newspapers have online sister publications as an additional service for readers and advertisers alike.  Both print and online editions consistently win industry awards for content, photography and design.  In all

- 2 -

its news products, the Debtors are committed to local news coverage and to the highest standards of journalism.  As of the Petition Date, the Debtors' newspapers employed approximately 1,847 full-time employees and approximately 335 part-time employees.

7.      The Debtors' city magazines, located in Athens, Augusta and Savannah, cover the people, issues and events of their respective communities.  In addition, many of the Debtors' daily newspapers produce additional magazines that regularly serve their respective communities with high quality local features.  Publications such as *Coastal Antiques and Art*, *Coastal Senior* and *Savannah Coastal Parent* are produced through the Morris daily newspaper the *Savannah Morning News*.  *Skirt!* is a free monthly magazine with circulation in 14 markets across the country that features content on issues important to women.

8.      Free community papers are dedicated advertising vehicles designed to provide customers with reliable, no-frills opportunities for sales and purchases, along with practical community news and information.  Both readers and advertisers look to these publications, popularly known as "shoppers," for quick contact, quick information and quick results.  The Debtors' shoppers are published in eight states and have a total circulation of approximately 230,000.

9.      Morris Publishing maintains its headquarters in Augusta, Georgia.  The Debtors' operations have been adversely affected by the general deterioration in the publishing and newspaper industries, particularly through the continuing severe decline in advertising revenue in this recession and the permanent loss to other media within various categories.  The current state of these industries is reflected in the chapter 11 filings of numerous other publishers and newspapers in recent months.

10.    In fiscal year 2008, the Debtors recorded revenues of approximately $321.8 million, resulting in a net loss of approximately $140.7 million.  During this time, advertising and circulation accounted for approximately 78.2% and 18.9% of the Debtors' revenue, respectively.  In fiscal year 2008, advertising revenue had declined to approximately $251.7 million (from approximately $306.7 million in 2007), and circulation revenue had increased to approximately $60.9 million (from approximately $57.6 million in 2007).

11.    More recently, for the nine month period ending September 30, 2009, the Debtors recorded revenues of $190.0 million (down from $243.1 million for the same period in 2008), resulting in a net loss of $13.2 million (compared to a net loss of $155.6 million for the same period in 2008).  During this time, advertising revenue declined by 28.6%, while circulation revenue increased by 5.6%.  At September 30, 2009, the Debtors' consolidated financial statements reported total assets and liabilities of approximately $175.5 million and $482.4 million, respectively.

12.    In early 2009, the Debtors entered into discussions with certain of their prepetition creditors to reduce the Debtors' substantial debt load and address liquidity concerns threatening the long-term viability of the company.  In September 2009, the Debtors reached agreement with an ad hoc committee (the "Ad Hoc Committee") of holders of the 7% Senior Subordinated Notes due 2013 (the "Old Notes") on the general terms of a comprehensive balance sheet restructuring of the Debtors' debt structure (the "Restructuring").  Pursuant to an October 30, 2009 Restructuring Support Agreement (as amended, the "Restructuring Support Agreement"), the Restructuring was to occur either through (a) an out-of-court offer (the "Exchange Offer") to acquire all $278.5 million in principal amount of outstanding Old Notes for $100 million aggregate principal amount of Floating Rate Secured Notes due 2014

(collectively, the "New Notes") or (b) alternatively, through cases filed under chapter 11 of the Bankruptcy Code and confirmation of a prepackaged chapter 11 plan (the "Plan").  The closing of the Exchange Offer was conditioned upon, among other things, at least 99% of the aggregate principal amount of Old Notes being validly tendered and not withdrawn.

13.     On December 14, 2009, the Debtors launched the Exchange Offer and also began soliciting votes to accept or reject the Plan, which contemplates a full recovery for all allowed claims other than those held by holders of Old Notes.  Because less than 99% of the aggregate principal amount of Old Notes were validly tendered and not withdrawn, a condition to closing the Exchange Offer was not satisfied.  Nonetheless, the Plan has been accepted overwhelmingly by the only class of creditors entitled to vote on the Plan.  Accordingly, contemporaneously herewith, the Debtors have filed the Plan and its accompanying disclosure statement, along with a motion seeking approval of the adequacy of the disclosure statement, approval of the solicitation procedures and confirmation of the Plan.  The Debtors believe that the Plan, once confirmed, will rationalize their balance sheet in a way that allows them to service their debt, fund future operations and support their long-term business plans.

**RELIEF REQUESTED**

14.     By this Motion,[2] the Debtors request the entry of an order, pursuant to sections 105(a) and 363(b) of Bankruptcy Code and Rule 6003 of the Federal Rules of

---

[2]     The Debtors filed, contemporaneously herewith, (i) Motion Of The Debtors For An Interim Order Authorizing The Debtors To (I) Continue Prepetition Insurance Policies And (II) Pay All Prepetition Obligations In Respect Thereof, (ii) Motion Of The Debtors For An Interim Order Authorizing, But Not Requiring, The Debtors To Honor Certain Prepetition Obligations To Customers And Otherwise Continue Prepetition Customer Programs And Practices In The Ordinary Course Of Business, (iii) Motion Of The Debtors For An Interim Order Authorizing, But Not Directing, The Payment Of Certain Prepetition Sales, Use, Franchise And Property Taxes, Licensing Fees, And Similar Obligations and (iv) Motion For An Interim Order Authorizing: (A) Payment Of Prepetition Employee Wages, Salaries, And Other Compensation; (B) Reimbursement Of Prepetition Employee Business Expenses; (C) Payments For Which Prepetition Payroll And Tax Deductions Were Made; (D) Contributions To Prepetition Employee Benefit

Bankruptcy Procedure (the "Bankruptcy Rules"),  to continue to pay, as they become due in the ordinary course of business, all of the Debtors' fixed, liquidated, noncontingent, and undisputed pre-petition unsecured claims, other than payments to the holders of the Old Notes, which claims are unimpaired under the Plan (the "Unimpaired Claims").   The Unimpaired Claims include, without limitation, claims of the Debtors' (a) newsprint suppliers, (b) printing process vendors, (c) haulers, (d) carriers, (e) the USPS and (f) specialized printers (collectively, with all other holders of Unimpaired Claims, the "Unimpaired Claimants").   The Debtors also request that the Court authorize and direct banks or other financial institutions maintaining the Debtors' accounts to honor and process any checks or electronic payment requests when presented for payment of an Unimpaired Claim.   Finally, the Debtors request that they be authorized to compel repayment from those Unimpaired Claimants who cease to honor Customary Trade Terms (defined herein) or such other trade terms as are agreed to with the Debtors.

## BASIS FOR RELIEF

15.    The Debtors do not seek to pay the Unimpaired Claimants the total aggregate amounts outstanding on the Petition Date in a lump sum; rather, the Debtors simply seek authority to pay such amounts as they become due in the Debtors' ordinary course of business.

16.    The Debtors submit that authority to satisfy the Unimpaired Claims will not create an imbalance of their cash flows because the majority of these obligations have

---

Programs; (E) Payment To Third Parties Of All Costs And Expenses Incident To The Foregoing Payments And Contributions; And (F) Applicable Banks And Other Financial Institutions To Honor And Pay All Checks And Transfers Drawn On The Debtors' Payroll Accounts To Make The Foregoing Payments. Those motions describe, in greater detail,  the particular facts and circumstances regarding the Debtors need to pay certain prepetition obligations.  The Debtors seek authority in this Motion to pay any Unimpaired Claims that would not otherwise be covered by those motions.

NGEDOCS: 1672799.5

customary payment terms and will not be payable immediately.  Based on past practice over the preceding three months, excluding payroll and other employee expenses and statutory obligations (such as taxes, which are comparatively small), the Debtors disburse approximately $5.6 million per month to operate their businesses in the ordinary course.  Of this amount, the Debtors estimate that approximately $2 million would constitute Unimpaired Claims (i.e., costs of the Debtors' operations that accrued prior to the Petition Date, remained unpaid as of the Petition Date, and which will become due in the ordinary course on or after the Petition Date).  Cash maintained by the Debtors and the cash generated in the ordinary course of business will provide sufficient liquidity for payment of the Unimpaired Claims.

17.    In exchange for payment of the Unimpaired Claims, the Debtors will, in their business judgment and as applicable, seek agreements from the Unimpaired Claimants receiving payment on their Unimpaired Claims to continue supplying goods and/or services to the Debtors on terms that are at least as favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Debtors and each Unimpaired Claimant at any time in the three months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Unimpaired Claimant.  The Debtors also reserve the right to negotiate new trade terms with any Unimpaired Claimant as a condition to any payment.

18.    The Debtors believe that circumstances may arise in which they should be entitled to recover payments made to the Unimpaired Claimants.  If an Unimpaired Claimant ceases to honor Customary Trade Terms, or such other trade terms as are agreed to with the Debtors, any payment made to such Unimpaired Claimant hereunder should be deemed an avoidable post-petition transfer under Section 549 of the Bankruptcy Code, recoverable by the

- 7 -

Debtors in cash upon written request. Upon such recovery, the Unimpaired Claim for which such payment initially was made shall be deemed to be reinstated as an Unimpaired Claim in the amount so recovered. In the event that an Unimpaired Claimant refuses to issue the repayment upon written request, the Debtors propose that they be authorized to compel such repayment by a motion in this Court.

19. In light of the prepackaged nature of these chapter 11 cases, the Debtors expect to emerge from chapter 11 on an expedited basis. Moreover, payment of the Unimpaired Claims in the Debtors' ordinary course of business is contemplated by the Plan. The Plan, a product of extended and good faith negotiations, is based on the primary negotiating parties' own desire to minimize disruption in the Debtors' businesses and maximize their enterprise values by providing full payment to the Unimpaired Claimants in the ordinary course of business. Given that these allowed claims are unimpaired as part of the proposed Plan, approval of this Motion merely affects the timing of such payments and not the ultimate recovery of any creditors. Accordingly, the Debtors respectfully submit that payment of the Unimpaired Claims in the ordinary course of business is especially appropriate here as the satisfaction of such claims is already a key feature of the Debtors' reorganization, necessary to preserve the value of their businesses, and will ease the Debtors' administrative burden and risk of business interruption during the very limited period pending confirmation.

## I. Payment of the Unimpaired Claims is Essential to the Debtors' Reorganization Efforts.

### A. Newsprint Suppliers and Printing Process Vendors.

20. Newsprint constitutes the principal raw material used by the Debtors to complete the printing of their various publications. The price of newsprint historically has been volatile, and the consolidation of North American newsprint mills over the years has reduced the

number of newsprint suppliers which, over the last year, has created increases in newsprint prices. The Debtors believe that a failure to pay the newsprint suppliers (collectively, the "Newsprint Suppliers") on a timely basis could negatively impact their existing relationships with them and, therefore, could adversely impact the Debtors' newsprint prices in the future. The Debtors further believe that, due to recent market downturns in the newsprint industry, any failure to pay the Newsprint Suppliers promptly may severely impact the financial condition of the Newsprint Suppliers. Moreover, if the Newsprint Suppliers fail to supply newsprint to the Debtors continuously and promptly, the Debtors' business operations would be disrupted significantly.

21.     In addition to newsprint, the Debtors' ability to complete the printing of their various publications is dependent on several other printing process materials. For example, the Debtors' printing process is heavily reliant on a continuous ink supply and a sufficient inventory of custom-fit newspaper plates to ensure that ink images can be successfully transferred to newsprint. Each of these printing process materials is essential to the production of the Debtors' publications. Further, several of the printing process materials are customized to fit the Debtors' needs and, as a result, are purchased by the Debtors from a single or limited number of suppliers (collectively, the "Printing Process Vendors"). Due to the critical nature of the continuous supply of these materials to the production of the Debtors' publications, it is essential to the Debtors' reorganization efforts that the delivery of these printing process materials continues without any delay.

22.     The Debtors estimate that approximately $500,000 in Unimpaired Claims will have arisen as of the Petition Date on account of the Unimpaired Claims of Newsprint Suppliers and Printing Process Vendors that provide necessary goods and services to the

Debtors.  The Debtors may be forced to shut down their operations in the event of a supply or service disruption.  Not only would the Debtors have squandered goodwill that they have developed with their customer base resulting from the adverse ripple effect caused by the disruption in the Debtors' businesses, any potential distribution to creditors could be diluted by claims asserted by the Debtors' customers on account of the Debtors' failure to timely produce its various publications.  If that were to happen, the interests of all creditors and parties in interest in these chapter 11 cases could be impaired severely.  In order to avoid this immediate and irreparable harm to the Debtors' estates, the Debtors submit that payment of the  Unimpaired Claims of the Newsprint Suppliers and Printing Process Vendors, on an ongoing post-petition basis, is necessary and appropriate in these cases.

> **B.**    **Shippers, Warehousemen and Customs and Duty Claimants.**

23.    The Debtors' business operations involve the production and distribution of multiple publications.  The Debtors utilize a number of third parties on a daily basis to ensure that newspapers ultimately reach the Debtors' subscribers and other readers, as described in more detail below.

24.    *First*, the Debtors frequently utilize reputable third-party common carriers and truckers (collectively, the "Haulers") to transport completed publications and supplies to and from the Debtors' printing facilities and distribution centers. [3]

---

[3]    Under most state laws, a shipper may have a lien on the goods in its possession, which then secures the charges or expenses incurred in connection with the transportation or storage of such goods.  Pursuant to section 363(e) of the Bankruptcy Code, the Haulers, as bailee[s], may be entitled to adequate protection in the form of a possessory lien.  For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  See U.C.C. § 7-307(1) (2003).  As a result, the Haulers may refuse to deliver or release the publications in their possession or control, as applicable, until their prepetition claims have been satisfied.

- 10 -

25.     *Second*, the Debtors utilize the services of approximately 1,500 independent contractors (the "Carriers") to deliver their publications from its distribution centers to subscribers' homes.  The Carriers are divided between those who are paid "per throw" (with the "per throw" price based on, among other things, the geographic location of the route) and those who are paid based on the difference between their contracted wholesale rate and the amounts collected from subscribers.

26.     *Third*, the USPS is responsible for delivering certain of the Debtors' publications to the Debtors' customers.[4]

27.     The Haulers, the Carriers and the USPS provide services to the Debtors in the ordinary course of business.  As an integral part of their business operations, the Debtors rely on the Haulers to transport finalized publications from their printing facilities to their distribution centers and on the Carriers and the USPS to transport several hundred thousand copies of their publications from the distribution centers to subscribers.[5]  If the deliveries from the Haulers, the Carriers and the USPS are interrupted, the Debtors will be unable to deliver their publications to their subscribers.  Any such delay would not only jeopardize the Debtors' ability to satisfy their obligations to their subscribers, but could, in turn, endanger the Debtors' ability to meet the audience base expectations of various advertisers who purchase advertisements in the Debtors' publications.

---

[4]     Prior to the Petition Date, the USPS had the ability to, in lieu of requiring deposits, draw directly from one of the Debtors' accounts via automated clearing house on account of the numerous postage machines the Debtors use across the country.  Without the ability to pay the prepetition amounts owed, the USPS likely would require the Debtors to post substantial deposits, causing potential delivery delays, at a time when the Debtors' need to (a) conserve cash to administer its bankruptcy estate and (b) demonstrate that business will continue as usual to maintain customer confidence and loyalty.

[5]     In some markets, Haulers also act as Carriers.

28.     It is estimated that, as of the Petition Date, the Debtors' will owe (a) approximately $40,000 to Haulers, (b) approximately $550,000 to Carriers and (c) approximately $35,000 to the USPS.

### C.     Specialized Magazine Printers.

29.     Certain printers, including RR Donnelley ("RRD") and Walton Press ("Walton"), are responsible for printing several of the Debtor's magazines, including *Skirt!*. These printers (collectively, the "Specialized Magazine Printers") are in a unique position to continue to print the Debtors' magazines, which require specially designed printing plates to accommodate the size and layout of the publications.  The Debtors would be unable to find replacements for the Specialized Magazine Printers quickly or without great expense.

30.     Failure to pay the Specialized Magazine Printers on account of their prepetition amounts owed could mean a delay in printing of several of the Debtors' publications, which would result in, among other things, (a) a disruption in service to the Debtors' customers and (b) a breach of agreements with advertisers who utilize placement in these publications.

31.     These consequences would disrupt the Debtors' operations at a time when it is critical for them to focus on customers and advertisers — the Debtors' primary sources of revenue.  As such, it would be in the interests of the Debtors, their creditors and these estates to pay the Specialized Magazine Printers on account of their prepetition amounts owed.

32.     The Debtors estimate that the amount owing to the Specialized Magazine Printers on account of prepetition obligations is, collectively, $125,000.

II.     **Payment of Pre-Petition Claims in the Ordinary Course of Business Will Not Affect Relative Distributions to Creditors Under the Plan.**

33.     As previously discussed, the Debtors have filed the Plan and, by way of a separate motion filed concurrently herewith,[6] are seeking, among other things, approval of the Disclosure Statement and confirmation of the Plan as soon as possible.   The proposed Plan (which was extensively negotiated among the Debtors and the Ad Hoc Committee) has been accepted by nearly 93% in number and 99% in amount of holders of Old Notes who voted on the Plan, including the treatment of the Unimpaired Claims therein.    The Plan seeks to pay the Unimpaired Claims in full.

34.     Because the proposed Plan provides that all general unsecured claims against the Debtors (other than holders of Old Notes) will be paid in full, no parties in interest will be prejudiced by the relief requested herein.   As a result, granting the relief requested herein will affect only the timing of the payment to such creditors and will not affect or impair the rights of other creditors in these chapter 11 cases.   Due to the pre-packaged nature of the Plan, and the Debtors' anticipation that they will emerge from chapter 11 within a short time period, payment of the Unimpaired Claims will allow the Debtors to reorganize with minimal disruption to their businesses.   Moreover, the Debtors do not seek to pay all Unimpaired Claims immediately, but only to pay such claims as they come due in the ordinary course of business during these cases.

35.     Moreover, many of the Unimpaired Claims that the Debtors seek to satisfy in the ordinary course of business would be treated as secured claims (as warehousemen's or

---

[6]     The Debtors have filed contemporaneously herewith a Motion For Entry Of Order (A) Scheduling An Objection Deadline And Combined Hearing On Their Disclosure Statement And Plan Confirmation, (B) Approving Form And Notice Of Confirmation Hearing, (C) Establishing Procedures For Objections To Their Plan And Disclosure Statement, (D) Approving Solicitation Procedures And (E) Granting Related Relief.

- 13 -

other liens under state law) or priority claims (under section 503(b) of the Bankruptcy Code) and would be paid in full even under a plan of reorganization that provided less than full recovery to general unsecured creditors.

36.    Finally, the cash generated in the ordinary course of the Debtors' businesses, will provide sufficient liquidity for payment of the Unimpaired Claims in the ordinary course of business.  Therefore, given that this Motion only proposes (a) altering the timing, and not the ultimate amount, of the payments to the Unimpaired Claimants, (b) paying many claims that would otherwise be secured or have administrative priority, and (c) preserving the value of the Debtors' businesses and easing the administrative burden on the Debtors' estates pending confirmation and effectiveness of the proposed Plan, the relief requested herein should be granted.

## III.    Legal Argument.

### A.    This Court May Authorize the Relief Requested as a Valid Exercise of the Debtors' Fiduciary Duties.

37.    The Debtors, operating their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code are fiduciaries "holding the bankruptcy estate[s] and operating the business for the benefit of . . . [their] creditors and (if the value justifies) equity owners."  In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  Id.

38.    Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  Id.  The CoServ court specifically noted that preplan satisfaction of pre-petition claims would be a valid

exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id.

39.    Payment of the Unimpaired Claims meets the test set forth in CoServ. The Debtors' realization of the substantial benefits described above, and the avoidance of the damaging consequences of not fulfilling their commitment to pay claims in the ordinary course, can only be achieved if they are granted the authority to pay Unimpaired Claims as requested in this Motion. Further, as described above, the shutdown of the Debtors' operations could cost the Debtors' estates millions of dollars in lost revenues and disrupt their ability to deliver publications to their customers. Under the Plan, the Unimpaired Claims will be satisfied in full, thus the proposed relief only seeks to alter the timing, and not the amount, paid on account of the Unimpaired Claims. Accordingly, the harm that would stem from the failure to pay the Unimpaired Claims is disproportionate to the amount of the Unimpaired Claims that the Debtors are seeking to pay hereunder. Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code by payment of the pre-petition claims. For these reasons, the Court should grant the relief requested herein.

**B.    This Court May Also Authorize the Payment of the Pre-Petition Claims Pursuant to Bankruptcy Code § 363.**

40.    This Court may also authorize the Debtors to pay the Unimpaired Claims pursuant to Section 363(b) of the Bankruptcy Code. That section provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although stated various ways, courts generally hold that a debtor's decision to enter into a transaction outside of the ordinary course of business is governed by the business judgment standard. 3 Collier on Bankruptcy 363.01[1][g] (15th ed. 2002). Under Section 363, a court may authorize a debtor to pay certain pre-petition claims. See

FV Steel and Wire Co., Case No. 04-22421 (Bankr. E.D. Wis. 2004 Feb 27, 2004) (SVK) (authorizing the continuation of customer programs and the payment of pre-petition claims under Section 363 of the Bankruptcy Code); In re Ionosphere Clubs, Inc., 98 BR. 174, 175 (Bankr. S.D.N.Y. 1989) (affirming lower court order authorizing payment of pre-petition wages pursuant to Section 363(b) of the Bankruptcy Code).  To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors."  Id.

C.     **The Court May Also Grant the Motion Pursuant to Section 105(a) of the Bankruptcy Code and the Necessity of Payment Doctrine.**

41.     The relief requested herein also is authorized under this Court's general equitable powers, which are codified in Section 105(a) of the Bankruptcy Code.  This section empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  Ionosphere Clubs, 98 B.R. at 175.  Under Section 105(a), this Court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor."  In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) ("to invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is 'critical to the debtor's reorganization'").

42.     Numerous courts have used their Section 105(a) equitable powers under the "necessity of payment"[7] doctrine to authorize payment of a debtor's pre-petition obligations

---

[7]     That doctrine, first articulated by the United States Supreme Court in Miltenberger v. Logansport Ry., 106 U.S. 286, 311-12 (1882), recognizes the existence of judicial power to authorize a debtor in a reorganization case to pay pre-petition claims when such payment is essential to the continued operation of the debtor.

- 16 -

when, as here, such payment was necessary to effectuate the "paramount purpose" of chapter 11 reorganization, which is to prevent the debtor from going into liquidation and preserve the debtor's potential for rehabilitation.  <u>See</u> <u>In re Lehigh & New England Ry. Co.</u>, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); <u>Ionosphere Clubs</u>, 98 B.R. at 176 (doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor"); <u>see also</u> <u>In re James A. Phillips, Inc.</u>, 29 B.R. 391, 394-95 (S.D.N.Y. 1983) (upholding the bankruptcy court's order authorizing the debtor to make post-petition payment of pre-petition claims in the ordinary course without notice and a hearing); <u>In re Chateaugay Corp.</u>, 80 B.R. 279 (S.D.N.Y. 1987).  The "necessity of payment" doctrine is consistent with the paramount goal of chapter 11, <u>i.e.</u>, "facilitating the continued operation and rehabilitation of the debtor . . . ." <u>Ionosphere Clubs</u>, 98 B.R. at 176.

> **D.    Section 549(a) of the Bankruptcy Code Implies Payments for Unimpaired Claims Should be Authorized.**

43.    Other Bankruptcy Code provisions imply that such payments for Unimpaired Claims may be authorized.  Section 549(a) of the Bankruptcy Code, which governs post-petition transfers, provides that "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . . that is not authorized . . . by the court." 11 U.S.C.  §  549(a).  Thus, by necessary implication, a bankruptcy court may authorize appropriate post-petition payments to satisfy pre-petition obligations.  <u>See</u> <u>In re NextWave Personal Commc'ns Inc.</u>, 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000) (noting that the ability to make payments on pre-petition debt is conditioned upon "notice and court approval" and noting

the ability to recover unauthorized payments pursuant to Section 549 of the Bankruptcy Code); Dubuque Packing Co. v. Stonitsch (In re Isis Foods, Inc.), 37 B.R. 334, 336 n.3 (W.D. Mo. 1984), appeal dismissed, Stonitsch v. LMJ Container Corp., 738 F.2d 445 (8th Cir. 1984) ("[P]roposed transfers [to pay pre-petition claims] may be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack.").

       44.    Moreover, it is common for courts to grant debtors broad authority to pay pre-petition claims in prearranged and prepackaged cases when the major constituents have already agreed on an unimpaired treatment for allowed pre-petition claims.  See, e.g., In re Charter Communications, Inc., Case No. 09-11435 (Bankr. S.D.N.Y. Apr. 15, 2009) (JMP) (authorizing payment of pre-petition claims during a prearranged chapter 11 case); In re Portola Packaging, Inc., Case No. 08-12001 (Bankr. D. Del. Aug. 29, 2008) (CSS); In re Hilex Poly Co. LLC, Case No. 08-10890 (Bankr. D. Del. May 7, 2008) (KJC); In re Remy Worldwide Holdings, Inc., Case No. 07-11481 (Bankr. D. Del. Oct. 10, 2007) (KJC) (authorizing payment of pre-petition claims during a prepackaged chapter 11 case); SMC Holdings Corp., Case no. 05-10395 (Bankr. D. Del. Feb. 11, 2005) (MFW) (authorizing payment of pre-petition general unsecured claims during a prepackaged chapter 11 case); In re MTS, Inc., Case No. 04-10394 (Bankr. D. Del. Feb. 10, 2004) (PJW).  In either the prearranged or prepackaged bankruptcy scenario, the doctrine of necessity has even greater significance, because it provides greater continuity during a chapter 11 proceeding that allows a debtor to consummate an already agreed upon transaction.

## IV.    The Requirements of Rule 6003 Are Satisfied.

       45.    If the Debtors are not authorized to pay Unimpaired Claims in the ordinary course of business, vendors may refuse to provide trade materials and shippers may refuse to deliver the Debtors' products to their customers.  Further, absent the relief, some parties may

refuse to continue to offer the Debtors customary and favorable trade terms.  Such actions would cripple the Debtors' operations, affect operating liquidity and further undermine customer confidence in the Debtors and their ability to manage operations effectively, thereby causing immediate and irreparable harm to their estates.  Conversely, as discussed above, the Debtors' authority to satisfy the Unimpaired Claims in the ordinary course of business would strengthen the perception among actual and potential counterparties that the Debtors intend to conduct business as usual and without disruption to the Debtors' operations.  Accordingly, the Debtors meet the "immediate and irreparable harm" standard of Rule 6003.

46.    Other courts have granted similar relief under Rule 6003.  See Hr'g Tr. May 7, 2008 at 33-37, In re Hilex Poly Co. LLC, Case No. 08-10890 (Bankr. D. Del. May 7, 2008) (KJC) (stating that not allowing the debtors to pay pre-petition claims in the ordinary course "arguably would cause immediate and irreparable harm to what prepacks are designed to do"); see also In re First NLC Fin. Servs. Inc., 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (approving interim retention of debtor's counsel under Bankruptcy Rule 6003).  The requested relief, therefore, is appropriate in this case.

## V.    Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Funds Transfers.

47.    The Debtors pay their Unimpaired Claimants with funds drawn by checks or by means of electronic fund transfers.  Before the Petition Date, the Debtors sent checks or electronic transfers on account of certain claims that may not have cleared as of the Petition Date.  To the extent any check or electronic transfer has not cleared their bank or financial institution as of the Petition Date, the Debtors request that the Court authorize the banks, in the Debtors' sole discretion, to receive, process, honor, and pay the checks or electronic transfers.  If the Unimpaired Claimants have not received payments for amounts owed, the Debtors seek

authority to issue replacement checks, re-issue electronic transfers, or otherwise make payment to such Unimpaired Claimants on account of their Unimpaired Claims.  The Debtors represent that each of the checks and electronic transfers can be readily identified as relating directly to the authorized payment of amounts owed on account of the Unimpaired Claims.  Accordingly, if the relief requested herein is granted, checks and electronic transfers other than those relating to authorized payments will not be honored inadvertently.

## **WAIVER OF STAY**

48.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h) of, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h)  As set forth above, immediate relief is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## **NOTICE**

49.     Notice of this Motion has been provided to:  (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the Southern District of Georgia; (iv) the Internal Revenue Service; (v) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis; (vi) counsel to the administrative agent for the Debtors' prepetition secured lenders; (vii) the indenture trustee with respect to the Debtors' Old Notes; and (viii) counsel to the Ad Hoc Committee.  In light of

the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **NO PRIOR REQUEST**

50.    No previous request for the relief sought herein has been made to this Court or to any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: Augusta, Georgia
            January 19, 2010

Respectfully submitted,

NEAL, GERBER & EISENBERG LLP
Mark A. Berkoff (*Pro Hac Vice* Pending)
Deborah M. Gutfeld (*Pro Hac Vice* Pending)
Nicholas M. Miller (*Pro Hac Vice* Pending)
Two North LaSalle Street, Suite 1700
Chicago, IL  60602-3801
Telephone: (312) 269-8000
Facsimile: (312) 269-1747

         -and-
 _/s/ James T. Wilson, Jr._____ _____
James T. Wilson, Jr. (Ga. Bar No. 768600)
945 Broad Street, Suite 420
Augusta, GA  30901-1289
Telephone: (706) 722-4933
Facsimile: (706) 722-0472
PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

NGEDOCS: 1672799.5